ALDEN W. SQUIRES, ET AL.
*vs.*
THE INHABITANTS OF THE CITY OF AUGUSTA,
H. LLOYD CAREY, MAYOR, AND LEO F. DUNN,
TREASURER

Kennebec.    Opinion, May 25, 1959.

152

*Goodspeed & Goodspeed,*
*Charles A. Pierce,*
*Sanborn & Sanborn,* for plaintiffs.

*Claude J. Bourget,*
*Sidney W. Wernick,* for defendants.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

TAPLEY, J.   On appeal.   A bill in equity was brought by thirteen taxable inhabitants of the City of Augusta against the inhabitants of that city and its mayor and treasurer. The plaintiffs by their bill seek to enjoin the defendants from carrying into effect the provisions of an ordinance and order passed by the Augusta City Council on June 17, 1957 relating to transportation of pupils to and from nonpublic schools.  The plaintiffs further seek to have this ordinance and appropriation order decreed as illegal, invalid, void and of no effect.  After a hearing on the bill, answer and replication, the justice below dismissed the bill and from this dismissal the plaintiffs seasonably appealed.

The ordinance and order upon which this litigation is based reads as follows:

"WHEREAS, children residing in the City of Augusta and attending the public schools pursuant

to and in compliance with the compulsory school-attendance laws of the State of Maine, and who reside at distances from the schools rendering their conveyance necessary, are presently afforded, at public expense, conveyance by motor vehicle to and from public schools; and

WHEREAS such conveyance is provided for the conservation of the comfort, safety and welfare of the children thus transported, and

WHEREAS such conveyance is not afforded to children residing in the City of Augusta who are attending schools other than public schools under and in compliance with the compulsory school-attendance laws of the State of Maine and who reside at unreasonable distances from the schools which they attend;

NOW THEREFORE, in order to facilitate attendance at school pursuant to the compulsory school-attendance laws of the State of Maine, by such children for whom such conveyance is not now provided and to assist and protect such children while they are on the highway in order to attend school under the compulsory school-attendance law of the State of Maine,

BE IT ORDAINED BY THE CITY COUNCIL of the City of Augusta, as follows:

ORDERED, That (a) The City of Augusta shall make available conveyance by motor vehicle to any child residing in Augusta (1) who is a pupil of elementary grade attending a non-public school (including a so-called 'parochial' school) pursuant to and in conformity with the compulsory school-attendance laws of the State of Maine, and (2) who resides more than one mile from the said school which such child attends.

(b)   Such conveyance shall be so provided as to conserve the health, safety and welfare of the children transported.

(c)   The Mayor of the City of Augusta is authorized to make contracts for a period of one year,

to employ such persons and to take such other and further action as may be necessary to effectuate the matters herein contained.

(d)   There is herewith appropriated from the contingent fund of the City of Augusta the sum of $250.00 to be expended for the purposes and matters herein provided during the remainder of the year, 1957."

The pertinent portion of the City Charter of Augusta reads:

"- - - - - and may ordain and publish such acts, laws and regulations not inconsistent with the Constitution and laws of this state, as shall be needful to the good order of said body politic; - - - - -."

Chap. 75, Sec. 1, P. L., 1919.

The factual aspect of the case is provided by an agreed statement of facts, in addition to which there appears the testimony of the Superintendent of Schools of Augusta. It so happens that the private schools here involved are parochial schools.

The agreed statement of facts explains in great detail the supervision and operation of the parochial schools in Augusta. It is a matter of public knowledge that the parochial schools are controlled and operated by the Roman Catholic Church. They are in effect private schools as distinguished from public schools and in the view which we take of this case are within the same category as any other private schools in the State. These parochial schools meet the standards of compulsory education and the pupils may lawfully attend them in lieu of attendance at public schools.

The appellants contend (1) that the ordinance and appropriation order of June 17, 1957 is illegal and is not authorized by either the statutes of the State of Maine or the Augusta City Charter; (2) that the ordinance and order is in violation of the Constitution of the State of Maine; (3)

that the ordinance and order is in violation of the Constitution of the United States. The contention of the appellees, briefly stated, is that the purpose of enactment of the ordinance and order was to provide transportation for private school children in order to conserve their health, safety and welfare, and that the City Council for the City of Augusta had authority to enact the ordinance and order as an exercise of its police power.

This case resolves itself into a single basic legal issue. Did the council have the authority to enact the ordinance by reason of police power?

It is agreed between the parties that the Legislature has not, either by charter or statute, given the City of Augusta by express terms the authority to pass any ordinance providing for the transportation of pupils to or from private schools.

The State controls the public schools and, to a substantial degree, maintains control and supervision over the private schools of the State. It compels education by providing (Chap. 41, Sec. 92, R. S., 1954, as amended) that every child between the 7th and 15th anniversaries of his birth shall attend some public day school. A child may satisfy this requirement if he obtains equivalent instruction for a like period of time in a private school in which the course and method of study have been approved by the designated educational authorities.

The Constitution of Maine, Art. VIII imposes the duty upon the Legislature to promote the cause of education. This, in effect, is in the nature of a constitutional mandate. In 1876 the then members of the Law Court of Maine had occasion to give their opinion relating to the authority and responsibility of the Legislature on the subject matter of schools and education. This *Opinion of the Justices* is recorded in 68 Me. 582. A pertinent quotation from the opinion is in the following language:

"In the constitution, it is declared that a general diffusion of education is essential to the preservation of the liberties of the people. By its very language, it would seem that the 'general diffusion of education' was to be regarded as especially a 'benefit' to the people. If so, then the legislature has *'full power'* over the subject matter of schools and of education to make all reasonable laws in reference thereto for the 'benefit of the people of this state.'" (Emphasis ours.)

In further support of the fact that the sovereign has maintained control of schools and education through the years is the following statement by the justices in their opinion:

"Accordingly, from the first institution of the government to the present day, *the general control of schools,* and the determination of what shall be a suitable provision by the towns for their support, has been fixed by legislative enactment." (Emphasis ours.)

It is important and advisable to review the statutory laws of the State, with the purpose and thought in mind of determining evidence of intention on the part of the State to maintain general control of education, as to both public and private schools. All legislation affecting the system of education in the State is compiled in Chap. 41, R. S., 1954, as amended. The chapter is entitled "Department of Education." We propose to cite such portions of this chapter (Chap. 41) as are pertinent in demonstrating the control and supervision which the State maintains through legislative enactments over the State's educational system.

Regarding the duties of the Commissioner of Education, **Sec. 11, Sub-sec. VII, as amended:**

"**VII.** To prescribe the studies to be taught in the public schools *and in private schools* approved for attendance and tuition purposes, reserving to superintending school committees, trustees or other officers in charge of such public *or private schools*

the right to prescribe additional studies, and the course of study prescribed by the commissioner shall be followed in all public schools and *in all private schools* approved by the said commissioner for attendance or tuition purposes; provided, however, that upon the approval by the said commissioner of any course arranged by the superintending school committee of any town, or by the trustees or other officers *of any private school,* said course shall be the authorized course for said town *or private school;* provided further, that the basic language of instruction in all schools, public *and private,* shall be the English language; and provided further, that American history and civil government, including the constitution of the United States and the declaration of independence, the importance of voting and the privileges and responsibilities of citizenship, shall be taught in all schools of elementary and secondary grades, both public *and private,* and that American history and civil government shall be required for graduation from all elementary schools, both public *and private.* Nothing in this section shall be construed to prohibit the teaching in elementary schools of any language as such. It is further provided that a course in geography and the natural and industrial resources of Maine shall be taught in at least one grade from 7 to 12, inclusive, in all school systems, both public *and private.*" (Emphasis ours.)

Pertaining to other school functions, we find (Sec. 14):

"- - - - The superintendent of schools in each town shall procure the conveyance of all elementary school pupils residing in his town, a part or the whole of the distance, to and from the nearest suitable school, for the number of weeks for which schools are maintained in each year, when such pupils reside at such a distance from the said school as in the judgment of the superintending school committee shall render such conveyance necessary. *In all cases, conveyance so provided shall conserve the comfort, safety and welfare of*

*the children conveyed and shall be in charge of a responsible driver who shall have control over the conduct of the children conveyed.* Contracts for said conveyance may be made for a period not to exceed 3 years. Provided, however, that the superintending school committee may authorize the superintendent of schools to pay the board of any pupil or pupils at a suitable place near any established school instead of providing conveyance for said pupil or pupils, when in their judgment it may be done at an equal or less expense than by conveyance. - - - -." (Emphasis ours.)

Sec. 43, as amended:

"Where the distance from the place of temporary residence to the school is more than 2 miles and transportation is deemed advisable by the superintending school committee or school directors, the superintendent of schools shall report the same to the commissioner with such other information as may be required and if so directed by the commissioner *shall procure transportation* for such child or children or, if transportation is inadvisable, board in lieu thereof; - - -." (Emphasis ours.)

Sec. 55: This section requires chest x-ray examinations for all superintendents of schools, supervisors, teachers, school nurses, janitors, *school bus drivers* and persons employed in the preparation of school lunches. This provision specifically applies to both public *and private schools.*

Sec. 92, as amended, is the compulsory education section requiring school attendance of children between 7 and 15 years of age and under some circumstances between the ages of 15 and 17. Under this section a child is not compelled to attend a public school provided that:

"- - - the child obtains equivalent instruction, for a like period of time, *in a private school* in which the course of study and methods of instruction have been approved by the commissioner, or in any

other manner arranged for by the superintending school committee or the school directors with the approval of the commissioner. Children shall not be credited with attendance *at a private school* until a certificate showing their names, residence and attendance at such school, signed by the person or persons having such school in charge, shall be filed with the school officials of the administrative unit in which said children reside." (Emphasis ours.)

Sec. 101, as amended, concerns itself in part with *transportation of pupils* to free high schools, while Sec. 119 treats *of transportation* to be provided by community school committees. The provisions of Sec. 164 relating to the education of children in unorganized territory provides in part for "*board and transportation* of elementary school pupils." (Emphasis ours.) A careful reading of the provisions of Chap. 41 will demonstrate that the Legislature has established a definite pattern for the creation and growth of the educational system of the State in all its varied and intertwining aspects.

From our study of the laws pertaining to education, we are convinced that the Legislature which enacted the various provisions intended that no municipality should regulate by ordinance or order any subjects which would affect or influence general education unless permitted to do so by an express delegation of power. To determine otherwise would be to disregard the clear intent of the Legislature and invite an interference on the part of any municipality within the State with the State's responsibility and constitutional duty to exert its " 'full power' over the subject matter of schools and of education - - - - -."

The State educational policy cannot and must not be interferred with by any subordinate governing body. *McQuillin-Municipal Corporations*, Vol. 5, Sec. 15.21:

"- - - Nor, under a general grant of power, can a municipal corporation adopt ordinances 'which in-

fringe the spirit, or are repugnant to the policy, of the state as declared in its legislation.' It follows that if the state has expressed through legislation a public policy with reference to a subject, a municipality cannot ordain in respect to that subject to an effect contrary to, or in qualification of, the public policy so established *unless there is a specific, positive, lawful grant of power by the state to the municipality to ordain otherwise.*" (Emphasis ours.)

The Legislature has seen fit to make the conveyance of pupils as much a component part of the public school program as the furnishing of text books, employment of teachers, prescribing subjects to be taught, construction and maintenance of school buildings and all other activities which compose a complete educational program.

The City of Augusta is a body politic and has only that authority to act which is given to it by the Legislature, as evidenced by its charter or by statute. The power of a town or city to appropriate money and to pass rules, orders and by-laws was first established in Maine by the provisions of Chap. 114, Sec. 6 of the Laws of Maine 1821. Sec. 6 reads as follows:

*"Be it further enacted,* That the citizens of any town, qualified as aforesaid, at the annual meeting for the choice of town officers, or at any other town meeting, regularly warned, may grant and vote such sum or sums of money as they shall judge necessary for the settlement, maintenance and support of the ministry, schools, the poor, and other necessary charges, arising within the same town, to be assessed upon the polls and property within the same, as by law provided; and they are also hereby empowered to make and agree upon such necessary rules, orders and bye-laws, for the directing, managing and ordering the prudential affairs of such town, as they shall judge most conducive to the peace, welfare and good order thereof; and to annex penalties for the observance of

the same not exceeding five dollars for one offence, to enure to such uses as they shall therein direct: *Provided*, They be not repugnant to the general laws of this State."

It is significant to note that there has been no substantial departure from the State's maintenance of authority over towns and cities in 137 years. The revision of the general laws relating to municipalities enacted in 1957 (R. S., Chap. 90A, P. L., 1957, Chap. 405) did no more than to consolidate and codify the powers and duties of municipalities. This statute did not become effective until subsequent to the effective date of the ordinance concerned in this case. We mention this 1957 legislation for the purpose of noting that there are no provisions contained therein, either expressed or implied, giving authority to the City of Augusta to pass the ordinance and order, had the legislation been in effect at the time of passage. The municipalities are still subject to the authority of the sovereign and have only those powers which are specifically delegated by the Legislature. See *Spaulding* v. *Peabody*, 153 Mass. 129. In *Frankfort* v. *Lumber Co.*, 128 Me. 1, on page 4, the court said:

" 'A municipal corporation has no element of sovereignty. It is a mere local agency of the State, having no other powers than such as are clearly and unmistakably granted by the law-making power.' "

See *Alley* v. *Inhabitants of Edgecomb*, 53 Me. 446; *Burkett* v. *Young, et al.*, 135 Me. 459.

In the case of *Lunn, et al.* v. *City of Auburn, et al.*, 110 Me. 241, the court in considering the power and authority of the City Council spoke in this manner:

*"We think it important to now discover the intention of the Legislature, for the intent of the Legislature is the law. - - - Further, if the Legislature had intended to confer upon the city council the power it now claims, it certainly would have done*

> *so by express grant and not by inference from general terms."* (Emphasis ours.)

The authority given by the Charter to the City of Augusta to enact ordinances contains this language: "and may ordain and publish such act, laws and regulations not inconsistent with the constitution and laws of this State, as shall be needful to the good order of said body politic." Within the meaning of these words or by force of any statute applicable to municipalities must be found the authority for the City Council to pass the ordinance and order. There is no express authority in the language of the Charter and no reasonable inference can be drawn therefrom that the Legislature granted the City Council the power to enact an ordinance providing for conveyance of school children to private schools, nor do the statutes confer a specific right to do so. The Charter negatives rather than affirms the right because it provides that the City may ordain only such acts and laws as are not inconsistent with the "laws of the State."

The order calls for the appropriation of $250.00 to be paid out of the contingent fund. The purpose of the appropriation is to finance the conveyance of pupils to private schools. Although the appropriation is to be taken from the contingent fund and not school funds, it nevertheless is derived from taxation, and in order to be legally expended, it *must be made available by lawful appropriation.* Public funds cannot be spent except for purposes authorized by law. This may come about by charter or statutory authorization but the authority must be strictly construed. "The words 'other necessary town charges,' do not constitute a new and distinct grant of indefinite and unlimited power to raise money for any purpose whatsoever, at the will and pleasure of a majority. They only embrace all incidental expenses arising directly or indirectly in the due and legitimate exercise of the various powers conferred by statute."

*Opinion of the Justices,* 52 Me. 595. See *Gale* v. *The Inhabitants of South Berwick,* 51 Me. 174; *Westbrook* v. *Deering,* 63 Me. 231.

The legal rights of municipalities are well defined as to their scope of authority in matters of raising, appropriating and spending public funds. Their powers and authority are determined within the structure of their Charters or by enabling acts. It is to be noted that the statutes have specifically provided for the expenditures of public money by towns and cities generally. There are numerous provisions providing for the financing of many educational activities, among which is the transportation of pupils in the public schools. There is nowhere to be found in the enabling statutes or in the Charter of the City of Augusta any authority, express or implied, for the Council to appropriate any sums for the conveyance of pupils to private schools.

Counsel for the defendants cite the case of *Everson* v. *Board of Education,* 330 U. S. 1, as applicable to the facts and circumstances of this case. The *Everson* case had its origin in the State of New Jersey *under a statute* authorizing local school districts to make rules and contracts for the transportation of children to and from *schools, including the transportation of school children to and from schools other than public schools,* excepting those schools which are operated for profit in whole or in part. The statute further provides that when any school district furnishes transportation for public school children from any point in an established school route to any other point on such established school route, the transportation shall be supplied to the school children residing in the district other than public school children, excepting those children who attend private schools operated for profit. The appellee (Board of Education of the Township of Ewing), acting in pursuance to the statute, authorized reimbursement to parents of money paid out by them for bus transportation of their children to pri-

vate schools. A portion of this money expended was for the payment of transportation of pupils to the Catholic parochial schools. The appellant contended that the statute and the resolution passed pursuant to it violated both the State and the Federal Constitutions, thereby presenting as an issue the constitutionality of the statute and the resolution. The Supreme Court of the United States, in a divided opinion, found that the statute and resolution were constitutional. We distinguish the *Everson* case from the case now under consideration. In the *Everson* case the State of New Jersey *enacted an enabling statute* specifically authorizing the Board of Education of school districts to provide transportation for all school children, both those attending public and private schools (except those private schools operated for profit). The issue was the *constitutionality* of the *statute* and the *resolution*. It was not, as in the instant case, that the resolution providing the transportation was passed without statutory authorization. This question was not involved in the *Everson* case.

The case of *Nichols* v. *Henry*, 301 Ky., 434, 191 S. W. (2nd) 930, 168 A. L. R. 1385, also cited by the appellees is based as is the *Everson* case on an enabling act and thus is distinguishable from the case at bar.

We are satisfied that a properly worded enabling act, authorizing municipalities to expend funds for the transportation of children to private schools not operated for profit, if one were in fact to be enacted by the Legislature, would meet constitutional requirements. In so saying we recognize that the decision of the Supreme Court of the United States in *Everson* is the law of the land and that the provisions of the Maine Constitution relating to the expenditure of public monies for public purposes and to the separation of church and state, carry no more stringent prohibitions than the First and Fourteenth Amendments to the Federal Constitution. We cannot, however, pass upon

the constitutionality of a statute which thus far has never been enacted by the Legislature. As already noted, we have searched in vain to find any provision of statute or charter authorizing the City of Augusta to appropriate public funds for transportation of children to private schools.

In our view of the case at bar, we do not reach the issue of the constitutionality of the ordinance and order. The decisive issue here is, did the City Council of Augusta have *authority from the Legislature* to enact the ordinance and order? We hold that the State of Maine has never, by enabling legislation or by the terms of the City of Augusta Charter, by express grant or implication, empowered or authorized the City Council to enact such an ordinance and order.

It is contended by the appellees that the ordinance and order as passed by the City Council of Augusta was a proper exercise of police power. There is no question but that the City of Augusta has and has always had authority to exercise police power. "The ordinary form of a city charter granting authority to enact ordinances not inconsistent with the Constitution and laws of the State is a delegation of authority to exercise the police power." *Opinion of the Justices,* 124 Me. 508. We recognize the sound principles of the proper use of police power and the necessity for it. This does not mean, however, that "police power" when assigned as a reason or authority for the enactment of an ordinance is sufficient to give validation to the act. When an enactment is founded on police power, the resultant legislation must stand the test as to whether it is a *proper* exercise of such power or not. McQuillin-Municipal Corporations, Vol. 6, Sec. 24.04:

> "The term 'police power' in a more limited sense, is not conceived to be all governmental power; it does not embrace, for example, the power of eminent domain or the power of taxa-

tion for revenue and *appropriation of public funds, - - - -."* (Emphasis ours.)

We cannot, however, subscribe to the use of police power when the end result is to defeat the intent of the Legislature. It is not conceivable that the Legislature when it delegated police power to the City of Augusta intended that it be used as authority to permit the passage of an ordinance providing for the conveyance of pupils to private schools and to use public funds for that purpose. The City Council is attempting to accomplish by police power what it is not authorized to do by its Charter or any enabling act of the Legislature, namely, to transport pupils to private schools. McQuillin-Municipal Corporations, Vol. 6, Sec. 24.46:

"Municipal police power is subject, of course, to limitations, including, of course, those applicable to police power generally. Its exercise must be consistent with the general laws of the State - - - -."

In this instance a use has been made of police power which is repugnant to and in derogation of the established policy of the State in its general scheme or plan for the promotion of education. McQuillin-Municipal Corporations, Vol. 5, Sec. 15.21:

"- - - Nor, under a general grant of power, can a municipal corporation adopt ordinances 'which infringe the spirit, or are repugnant to the policy, of the state as declared in its legislation.' It follows that if the state has expressed through legislation a public policy with reference to a subject, a municipality cannot ordain in respect to that subject to an effect contrary to, or in qualification of, the public policy so established *unless there is a specific, positive, lawful grant of power by the state to the municipality to ordain otherwise.*" (Emphasis ours.)

In the case of *Fieldcrest Dairies* v. *City of Chicago*, 122 F. (2nd) 132, on page 138, the court had this to say:

"The authorities are uniform that any ordinance which conflicts with any statute or public policy adopted by the State Legislature is invalid. The rule is aptly stated in 2 McQuillin on Municipal Corporations, 572: 'A Municipal corporation cannot, without special authority, prohibit what the policy of a general statute permits. Nor, on the other hand, can an ordinance permit that which the State's policy forbids. Consequently under a general grant of power, a municipal corporation cannot adopt ordinances "which infringe the spirit, or are repugnant to the policy of the state as declared in its legislation." *It thus follows that if the state has expressed through legislation a public policy with reference to a subject, a municipality cannot ordain in respect to that subject to an effect contrary to, or in qualification of the public policy so established. - - -.'*" (Emphasis ours.)

Since 1821 to the present time the Legislature has been definite and cautious in its delegation of authority to towns and cities. The State has always maintained general control of education, in all its phases, and when use of public funds by towns and cities for school or any other purposes has been permitted, the authorization has been specific and well defined. There has been no uncertainty as to intent. Had the Legislature which enacted the revision of the laws relating to municipalities in 1957, or any Legislature preceding it, intended that municipalities be authorized to pass ordinances providing for transportation of pupils to private schools, it would have said so in clear and unmistakable language. It is not for us to read into the statutes an intent which is obviously not there.

The City Council of the City of Augusta was without legislative authority to enact the ordinance and order providing for the conveyance of pupils of elementary grades

attending non-public schools and the expenditure of public funds for this purpose would be unlawful.

It has come to the attention of the court that the terms of office of the mayor and city treasurer in office at the time of the commencement of this litigation have terminated. The case has been fully briefed and argued. The case should be remanded to the court below to give reasonable opportunity for the appellants to move to join the present mayor and present city treasurer of Augusta as parties defendant, and thereupon, such motion being granted, a decree may be entered in accordance with this opinion.

The entry will be,

*Appeal sustained.*

*Remanded to the court below for further proceedings in accordance with this opinion.*

Dissenting Opinion...Sullivan, J., Dubord, J.

This is an appeal from a *pro forma* decree of a justice dismissing a bill in equity instituted under the authority of R. S. (1954), c. 107, § 4, paragraph XIII, by the plaintiff taxpayers against the City of Augusta, its mayor and its treasurer.

On June 17, A. D. 1957 the City Council and legislative body of the City of Augusta had enacted the following ordinance and order:

"WHEREAS, children residing in the City of Augusta and attending the public schools pursuant to and in compliance with the compulsory school-attendance laws of the State of Maine, and who reside at distances from the schools rendering their conveyance necessary, are presently afforded, at public expense, conveyance by motor vehicle to and from public schools; and

"WHEREAS such conveyance is provided for the conservation of the comfort, safety and welfare of the children thus transported and

"WHEREAS such conveyance is not afforded to children residing in the City of Augusta who are attending schools other than public schools under and in compliance with the compulsory school-attendance laws of the State of Maine and who reside at unreasonable distances from the schools which they attend;

"NOW THEREFORE, in order to facilitate attendance at school pursuant to the compulsory school-attendance laws of the State of Maine, by such children for whom such conveyance is not now provided and to assist and protect such children while they are on the highway in order to attend school under the compulsory school-attendance law of the State of Maine,

"BE IT ORDAINED BY THE CITY COUNCIL of the City of Augusta, as follows:

ORDERED, That (a) the City of Augusta shall make available conveyance by motor vehicle to any child residing in Augusta (1) who is a pupil of elementary grade attending a non-public school (including a so-called "parochial" school) pursuant to and in conformity with the compulsory school-attendance laws of the State of Maine, and (2) who resides more than one mile from the said school which such child attends.

"(b)    Such conveyance shall be so provided as to conserve the health, safety and welfare of the children transported.

"(c)    The Mayor of the City of Augusta is authorized to make contracts for a period of one year, to employ such persons and to take such other and further action as may be necessary to effectuate the matters herein contained.

"(d)    There is herewith appropriated from the contingent fund of the City of Augusta the sum of $250.00 to be expended for the purposes and matters herein provided during the remainder of the year, 1957."

By the bill in equity the plaintiffs seek to nullify the ordinance complaining that such ordinance can in fact apply only to two existing parochial schools conducted under the auspices of the Roman Catholic Church, that the City enjoys no delegated competency by charter, statute or the constitution to adopt the measure and that the ordinance violates the Constitution of Maine and the Constitution of he United States.

The record consists of the pleadings, decree, and agreed statement of facts and the testimony of the superintendent of the public schools of Augusta. The parochial schools are elementary grade units compositely having 920 pupils, 308 of whom reside a mile or more from their respective schools. Such scholars are formally taught religion and morality as required courses. Such schools are concededly functioning in full compliance with the statutory educational require-

ments of the State and their graduates are accepted to the public high school with plenary approbation. There are no other private schools in Augusta.

The sitting justice concluded that in judicial propriety he should honor precedent and sustain the validity of the ordinance upon the basis of presumptive legality.

The appellants contend that the Legislature by constitutional limitation possessed no authority to delegate to the City of Augusta the sanction to promulgate such an ordinance, that the Legislature had never affected to bestow upon the City such power either by statute or by charter, and that for want of some warranted enabling act of the Legislature the City has acted *ultra vires*. The appellants argue that school 'bus transportation is an integrated school activity and by the municipal charter only the board of education can effect the expenditure of any school moneys. They argue that private schools may be regulated by the sovereign but not subsidized by it and that public funds may not be appropriated for sectarian purposes. They assert that the act violates the Constitution of Maine in that it illegally prefers one religious denomination and provides an appropriation for a private purpose. They protest that the ordinance offends against the Constitution of the United States and that this court should adopt the reasoning of the minority justices contained in a decision of the United States Supreme Court in order to give heed to the censure of the appellants.

In so far as this ordinance makes and dedicates an appropriation for the transportation of non-governmental school children this court cannot, if it would, seriously entertain the protestations from the appellants that the enactment therefore violates the National Constitution. There is unimpeachable auhority to the contrary in the decision of the United States Supreme Court in the case of *Everson* v. *Board of Education* (1947), 330 U. S. 1. In effect the appel-

lants in their brief acknowledge that insurmountable reality but, nevertheless, persist that the decision was a split one and urge that we refrain from conforming with the majority of the highest court in the land. The tradition and the respectful duty of this court have been clearly settled:

"We shall not repeat the reasoning by which this conclusion is sustained by the Supreme Court of the United States. It is sufficient to say that it is full, and we think satisfactory. But whether satisfactory or not, it must be acquiesced in by the State courts, for the question arises under the federal constitution, and it is the duty of the Supreme Court of the United States to answer it, *and their answer is conclusive upon the State courts. - -*" (Emphasis supplied.)

*State* v. *Furbush* (1881), 72 Me. 493, 496.

"This is a federal question, and if we could have any doubt about it, *we are bound to follow the law as decided by the federal court of last resort.*" (Emphasis supplied.)

*Whitney* v. *Burger* (1886), 78 Me. 287, 295.

"But it seems, by recent decisions of the U. S. Supreme Court *(by which this Court, agreeing or not, is bound) - - - -*" (Emphasis supplied.)

*Waterville Realty Corp.* v. *Eastport* (1939), 136 Me. 309, 315.

"- - - - The decision of the Supreme Court of the United States upon the question of the interpretation and application of the commerce clause of the Federal Constitution *is conclusive and binding upon this court. - - - -*" (Emphasis supplied.)

*Higgins* v. *Carr Brothers Co.* (1942), 138 Me. 264, 271.

Cognizant of universal compulsory school attendance the case of *Everson* v. *Board of Education, supra,* renders unavailing the arguments of these appellants that school 'bus transportation is by nature an inherent school activity, that

transportation of private school pupils when publicly supported is a subsidy to the private schools and that public funds when so utilized are thereby applied to a private purpose to the preference of one religion before another and to a sectarian purpose.

The United States Supreme Court said:

P. 5. "The only contention here is that the state statute and the resolution, insofar as they authorized reimbursement to parents of children attending parochial schools, violate the Federal Constitution in these two respects, which to some extent overlap. First. They authorize the State to take by taxation the private property of some and bestow it upon others, to be used for their own private purposes. This, it is alleged, violates the due process clause of the Fourteenth Amendment. Second. The Statute and the resolution forced inhabitants to pay taxes to help support and maintain schools which are dedicated to, and which regularly teach, the Catholic Faith. This is alleged to be a use of state power to support church schools contrary to the prohibition of the First Amendment which the Fourteenth Amendment made applicable to the states."

P. 7. *"It is much too late to argue that legislation intended to facilitate the opportunity of children to get a secular education serves no public purpose.* Cochran v. Louisiana State Board of Education, 281 U. S. 370; Holmes, J., in Interstate Ry. v. Massachusetts, 207 U. S. 79, 87. See opinion of Cooley, J. in Stuart v. School District No. 1 of Kalamazoo, 30 Mich. 69 (1874). The same thing is no less true of legislation to reimburse needy parents, or all parents, for payment of the fares of their children so that they can ride in public busses to and from schools *rather than run the risk of traffic and other hazards incident to walking or 'hitchhiking'."* See Barbier v. Connolly, supra, at 31 (113 U. S. 27, 31 - 32) See also cases collected 63 A L. R. 413; 118 A. L. R. 806. Nor

does it follow that a law has a private rather than a public purpose because it provides that tax-raised funds will be paid to reimburse individuals on account of money spent by them in a way which furthers a *public* program. See Carmichael v. Southern Coal & Coke Co., 301 U. S. 495, 518." (Emphasis supplied.)

P. 18. - - - *"Of course, cutting off church schools* from these *services so separate and so indisputably marked off from the religious function, would make* it far more difficult for the schools to operate. But such is obviously not the purpose of the First Amendment. That Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. *State power is no more to be used so as to handicap religions than it is to favor* them." (Emphasis supplied.)

P. 18. "This Court has said that parents may, in the discharge of their duty under state compulsory education laws, send their children to a religious rather than a public school if the school meets the secular educational requirements, which the state has power to impose. See Pierce v. Society of Sisters, 268 U. S. 510. It appears that these parochial schools meet New Jersey's requirements. *The State contributes no money to the schools. It does not support them. Its legislation, as applied, does no more than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools."* (Emphasis supplied.)

It is to be noted that the United States Supreme Court in the *Everson* case not only affirmed the constitutionality of legislation providing for transportation of private school pupils at public expense under the "child benefit theory" but in upholding such a transportation law against the contention that it violated the First Amendment to the Federal Consitution the court indeed grounded its decision upon the

right of free exercise of religion guaranteed by that First Amendment.

In the case of *Cochran* v. *Board of Education* (1930), 281 U. S. 370, the United States Supreme Court scrutinized a statute of the State of Louisiana supplying from public tax money secular school books free of cost to the school children of that State. Taxpayers of the State had sought to restrain the State officials from furnishing any such books to children attending private schools. The court unanimously affirmed a State court judgment against the taxpayers in a decision by Chief Justice Hughes who said:

"The contention of the appellant under the Fourteenth Amendment is that taxation for the purchase of school books constituted a taking of private property for a private purpose. Loan Association v. Topeka, 20 Wall. 655. The purpose is said to be to aid private, religious, sectarian, and other schools not embraced in the public educational system of the State by furnishing text-books free to the children attending such private schools. The operation and effect of the legislation in question were described by the Supreme Court of the State as follows (168 La., p. 1020) ;

'One may scan the acts in vain to ascertain where any money is appropriated for the purchase of school books for the use of any church, private, sectarian or even public school. The appropriations were made for the specific purpose of purchasing school books for the use of the school children of the state, free of cost to them. *It was for their benefit, and the resulting benefit to the state that the appropriations were made.* True, these children attend some school, public or private, the latter, sectarian or non-sectarian, and that the books are to be furnished them for their use, free of cost, whichever they attend. *The schools, however, are not the beneficiaries of these appropriations.* They obtain nothing from them, nor are they relieved of a single obligation, because of them. The school children and the state above are

beneficiaries. It is also true that the sectarian schools, which some of the children attend, instruct their pupils in religion, and books are used for that purpose, but one may search diligently the acts, though without result, in an effort to find anything to the effect that it is the purpose of the state to furnish religious books for the use of such children - - - What the statutes contemplate is that the same books that are furnished children attending public schools shall be furnished children attending private schools. That is the only practical way of interpreting and executing the statutes, and this is what the state board of education is doing. Among these books, naturally none is to be expected adapted to religious instruction. The Court also stated, although the point is not of importance in relation to the Federal question, that it was 'only the use of the books that is granted to the children, or, in other words, the books are lent to them.' "

*"Viewing the statute as having the effect thus attributed to it, we can not doubt that the taxing power of the State is exerted for a public purpose.* The legislation does not segregate private schools, or their pupils, as its beneficiaries or attempt to interfere with any matters of exclusively private concern. Its interest is education, broadly; its method, comprehensive. *Individual interests are aided only as the common interest is safeguarded."* (Emphasis supplied.)

The ordinance in the instant case is not violative of the Federal Constitution because of the benefit bestowed, the providing of publicly paid 'bus transportation for private school pupils. Some nineteen states now have such laws.

The appellants assail the ordinance as multipliedly infractious of the State of Maine Constitution. Some of their reasons advanced have been distinguished away and refuted by the eminent authority already quoted. The ordinance will be found to prefer no religion. It embraces private schools as a replete category whether conducted as re-

ligious or religiously indifferent institutions. The enactment provides for something physical, not spiritual, mental or educational, to wit, transportation by bus. No church, school or person can receive any direct grant. The indirect aid conferred is to taxpaying parents who already are supporting public school buses and to scholars who are citizens of this State and not second class citizens just because they attend private schools. The ordinance affords an extra curricular public welfare service. It is an exercise of police power much as the supplying of public vaccine, school lunches, public X-ray examinations or dental inspections. The transportation in a measure is a complement and neutralizer of the compulsion imposed by the law of this State upon parents and children that the children attend some standardized school of the parents' designation.

The Kentucky Court of Errors and Appeals in the case of *Nichols* v. Henry (1945), 301 Ky. 434, 191 S. W. (2nd) 930, 934, held:

> "In this advanced and enlightened age, with all of the progress that has been made in the field of humane and social legislation, *and with the hazards and dangers of the highway increased a thousandfold from what they formerly were, and with our compulsory school attendance laws applying to all children and being rigidly enforced,* as they are, *it cannot be said with any reason or consistency that tax legislation to provide our school children with safe trnsportation is not tax legislation for a public purpose. Neither can it be said that such legislation, or such taxation, is in aid of a church or of a private sectarian, or parochial school, nor* that it is other than what it is designed purports to be, as we have stated hereinabove - - - - legislation for the health and safety of our children, the future citizens of our state. The fact that in a strained and technical sense the school might derive an indirect benefit from the enactment, is not sufficient to defeat the declared pur-

pose and the practical and wholesome effect of the law." (Emphasis supplied.)

From a leading law periodical:

"- - - Despite these arguments the fact that the highways are extremely dangerous, especially to children, should be sufficient to induce a court to hold that an effort by the state to protect all children is a valid exercise of police power. *If this is the purpose of the statute providing free transportation, the children may well be considered its true beneficiaries, and any advantage received by the private and parochial schools incidental and immaterial.*" (Emphasis supplied.) 51 Harvard Law Review, 935. (1938.)

In *Board of Education* v. *Wheat,* 174 Md. 314, 199 A. 628, 631 the court upheld the State Constitutionality of a law affording free transportation by the State to private school pupils and said:

"Whether it (the use of public funds) is private within that rule appears to be finally, a question whether it is in furtherance of a public function in seeing that all children attend some school, and in doing so have protection from traffic hazards. School attendance is compulsory, and attendance at private or parochial schools is a compliance with the law. - - - The fact that the private schools, including parochial schools, receive a benefit from it could not prevent the Legislature's presuming the public function."

The Constitution of the State of Mississippi contained the following section (208):

"No religion or other sect or sects shall ever control any part of the school or other educational funds of this state; nor shall any funds be appropriated toward the support of any sectarian school, or to any school that at the time of receiving such appropriation is not conducted as a free school."

The Supreme Court of Mississippi in an elaborate opinion denied a taxpayers' prayer for an injunction to prevent the public officials from granting to private school pupils, in accordance with a State statute, secular books purchased with State tax funds. The court held, *inter alia:*

> "The religion to which children of school age adhere is not subject to control by the state; but the children themselves are subject to its control. If the pupil may fulfil its duty to the state by attending a parochial school it is difficult to see why the state may not fulfil its duty to the pupil by encouraging it 'by all suitable means'. *The state is under duty to ignore the child's creed, but not its need.* It cannot control what one child may think, but it can and must do all it can to teach the child how to think. *The state which allows the pupil to subscribe to any religious creed should not, because of his exercise of this right, proscribe him from benefits common to all.*

> - - - - - - - - - -

> "Calm reason must not be stampeded by random cries of church or state or sectarian control, or by the din from the conflict of catechism and dogmatism. A wholesome sanity must keep us immune to the disabling ptomaine of prejudice. If throughout the statute there are words which arrest the attention of over-sensitized suspicion and are seen by a jaundiced eye as symptoms of secular control, one may regain composure by viewing the state's book depository as a great public library of books available to all, which sells any book to anybody, and which, subject to reasonable regulation, allows the free use thereof to *any* child in *any* school." (Emphasis supplied.) *Chance* v. *Mississippi State Textbook Rating and Purchasing Board* (1941), 190 Miss. 453, 200 So. 706.

The appellants in the instant case object that the Augusta ordinance is unconstitutional in that the appropriation entailed is a public fund which is to be expended for private purposes. No pains were taken by the appellants to demonstrate that furnishing public bus rides from general

revenues to private or parochial school pupils constitute tax support of a school or church. They leave the assertion without customary amplification and we find ourselves at a complete loss to conjecture what direct aid could possibly result to church or school. The ordinance is an application of police power. It is typical of police power service or public welfare measures adopted by any authority that indirect advantages inure to private citizens and private organizations. Traffic acts, fire, police protection, compulsory vaccination, health ordinances and countless similar regulations of the sovereign, primarily for health and welfare in its public school system are of incidental benefit to private individuals, parents and their children attending public schools and in certain instances incidentally and secondarily of aid to parochial schools. Yet the State or its local divisions are not because of the foregoing resultants reduced to impotency or inhibited from legislating for its own primary safety and welfare.

The instant case is concerned with no attempt by the State or municipality to subsidize a private school.

Appellants combat the ordinance as "unconstitutional in that it prefers one religious denomination." The ordinance is not restricted to parochial schools but legislates concerning public bus rides to *all* private schools. A stipulation of this case states in substance that at the time of the hearing the only private schools in Augusta qualifying for the transportation service were parochial. There may be other private schools at this time or at some future date:

> " 'The motive of the framers to discriminate against a certain class which does not appear from the language of the ordinance or statute will not make the enactment void or unconstitutional.' Soon Hing v. Crowley, 113 U. S., 709. 'Evidence as to the motive of the framers of the law or the influences under which they (sic) are enacted is

not admissible for the purpose of nullifying an ordinance.' - - -"

*Inhab. of Skowhegan* v. *Heselton* (1917), 117 Me. 17, 20.

" - - - Class legislation, discriminating against some and favoring others, is prohibited, but legislation, which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the (14th) amendment."
*State* v. *Phillips* (1910), 107 Me. 249, 256.

The ordinance reveals and our statutes confirm that public school pupils already have public bus transportation available to them. The ordinance essays to supply such a facility for private school pupils as a class.

The ordinance primarily serves a public function and not a religious one. *Everson* v. *Board of Education, supra.*

No church or school is a beneficiary.

" - - - It was for their (the childrens') benefit, and the resulting benefit to the state that the appropriations were made - - - The schools, however, are not the beneficiaries of these appropriations."

*Cochran* v. *Board of Education, supra.*

The ordinance does not prefer any religion and in fact confers a public benefit without direct aid to religion or school.

Appellants advocate "the wall between church and state," "the separation of church and state," as indispensable to religious equality and freedom. The first of the two expressions was employed by the court in *Everson* v. *Board of Education, supra,* and was in reality a concession to secular humanism. It is a figure of speech. In 1934, Cardozo, J., in *Snyder* v. *Massachusetts,* 291 U. S. 97, 114, had warned against dependence on metaphors:

"A fertile source of perversion in constitutional theory is the tyranny of labels. - - - -"

Professor Sutherland in *Due Process and Disestablishment,* 62 Harvard Law Review, 1306, 1311 (1919), wrote:

"The wall of separation is a very satisfying metaphor. It has a fine, tangible, firm sound. No one can doubt where a stone wall is. *But a metaphor is generally more effective as a slogan than usable as a definition;* - - - -" (Emphasis supplied.)

" - - - one mark of naivete of mind being a preference for slogans over solutions." *Prof. Edwin S. Corwin: The Supreme Court as National School Board*

To debate a metaphor, a clarifying definition of terms is mandatory or disputants soon find themselves bereft of a common issue.

Neither in the Constitution of the United States nor in the Constitution of the State of Maine are to be found "the wall beween church and state" or "the separation of church and state" as terms or as requisitions. In the First Amendment to the Federal Constitution and in Article 1, Section 3 of our Maine Constitution the disestablishment of religion is guaranteed together with freedom of religion. "Disestablishment" precludes an official state religion. It does not doom American or Maine society to be godless.

" - - - No state has had an established religion in the sense of a frankly tax-supported chosen sect since Massachusetts disestablished the Congregational church in 1833." *Sutherland, supra,* P. 1309.

The preamble of both the Federal and Maine Constitutions begins with identical words, *"We the people of"*—Our national and state governments are the people acting in binding and patriotic allegiance through the legal and political instruments of their sovereign societies. Our religions are groups of persons and their clerical superiors.

When we speak of "church" or of "state" we are talking about people, persons, human individuals in composite social groups. Neither the "state" nor the "church" is an objective entity existing by itself somewhere. Our people are singularly and individually citizens both of this State and Nation and generally they are also adherents of a religious faith or other, espoused for himself by each person. They confess and are conscious of no separations or rifts within themselves, no inside walls, real or figurative, no split in personality between the religious and civic ego. They are not all in accord with their fellows upon religious or civic subjects but few will countenance real separations or walls in reference to their compatriots. If we wish to ignore temptations of rhetoric and express the true *modus vivendi* in Maine and America, it is this: we have all solemnly covenanted by our constitutions, and we shall require, that no religion may be preferred before any other by either, people's government and that religious liberty must always obtain for all. Synchronously with these edicts of disestablishment of state religion and of freedom of worship each constitution hastens its guarantee and its blessing to each citizen exhorting him to worship God according to his light, for American society and that of Maine are pluralistic in religion and culture and "religion is the dynamic element in culture." (Prof. Christopher Dawson.) A judicious cooperation between leavens, religious and politic, is therefore constantly indicated. As a practical necessity there must be sponsored and observed the intelligently balanced arrangement availing in the sound policies of well reasoned decisions rather than the perturbed and sweeping application of fearsome "aid to religion" interpretations. Problems there must be but resolvable generally by considerations of degree. Common sense will often suffice. Piety need never be segregated from civic affairs. History is a witness that it never has been, permanently. Piety "buries its undertakers." Our court in *State* v. *Mockus* (1921), 120 Me. 84,

93, demonstrated an admirable appreciation of the golden mean within the subject by enforcing the blasphemy statute.

The United States Supreme Court since revivifying the metaphor of "a wall between church and state" in *Everson* v. *Board of Education, supra,* has veered away from it to the doctrine of emphasis upon cooperation between church and state, so-called, as constitutionally acceptable and right for implementing the exercise of freedom of religion. In the case of *Zorach* v. *Clauson* (1952), 343 U. S. 306, in which the then incumbent Attorney General of Maine filed an effective brief as *amicus curiae,* it was held: (Douglas, J.)

> P. 312. " - - - There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated. And so far as interference with the 'free exercise' of religion and an 'establishment' of religion are concerned, the separation must be complete and unequivocal. The First Amendment within the scope of its coverage permits no exception; the prohibition is absolute. The First Amendment, however, does not say that in every and in all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise the state and religion would be aliens to each other—hostile, suspicious, and even unfriendly. Churches could not be required to pay even property taxes. Municipalities would not be permitted to render police or fire protection to religious groups. Policemen who helped parishioners into their places of worship would violate the Constitution. Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; "So help me God" in our courtroom oaths - - - these and all other references to the Almighty that run

through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: 'God save the United States and this Honorable Court.' "

P. 313. *"WE are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary.* We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. *When the state encourages religious instruction or co-operates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of traditions.* For it then respects the religious nature of our people and accomodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement *that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe.* Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. *But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence.* The government must be neutral when it comes to competition between sects. - - -"

P. 315. - - - - *"We cannot read into the Bill of Rights such a philosophy of hostility to religion."* (Emphasis supplied.)

The instant case is concerned with no attempt by the State or municipality to subsidize a private school.

Appellants protest that the ordinance offends against the principles guiding the framers of the Maine Constitution and against the mandate of separation of church and state as contained in that Constitution. (Art. 1, Sec. 3.) Appellants array excerpts from "Perley's Debates." The theories presently advanced by the appellants are not the policy of the framers of the Constitution who actually disestablished secular orthodoxy along with the state (Mass.) church and in effect allocated both state and religion each to its distinct sphere of activity with cooperation in areas of common interest, e.g., education, marriage, etc., over particular aspects of which each society has authority and in an harmonious exercise of which authority will be found religious liberty. Such a policy is expressed within the Constitution. We reiterate—the framers and the Constitution negate an established church but do not relegate religion or evince hostility to it. The framers and the Constitution are tolerant and typical of the years following the American Revolution. E. E. Y. Hales, eminent English historian, now of the Ministry of Education in London, is authority that theories not wholly unlike those championed by the appellants result from the "Nativist" movement, 1830's - 1850's, contemporaneous with some immigrations.

The product of the sage thinking of the framers and the content of the Constitution are more eloquent and conclusive than the debates in convention.

We have only to read:

" - - - the legislature are authorized, and it shall be their duty - - - - to encourage and suitably endow, from time to time, as the circumstances of the people may authorize, all academies, colleges and seminaries of learning within the state: provided, that no donation, grant or endowment shall at any time be made by the legislature as to any literary institution now established, or which may hereafter be established, unless, at the time of making

such endowment, the legislature of the state shall have the right to grant any further powers to, alter, limit or restrain any of the powers vested in, any such literary institution, as shall be necessary to promote the best interests thereof."

*Constitution of Maine,* Article VIII.

In 1820 few if any public schools as we conceive them existed in New England. In Maine the "academies, colleges and seminaries" had, and those extant for the most part have, a religious reference.

We quote a resolve in favor of Waterville College. In 1813 Massachusetts chartered Maine Literary and Theological Institute. In 1818 the name was changed to Waterville College and in 1867 to Colby College. This favorably known institution of learning, in 1828, was sectarian, Baptist.

"Resolve for the benefit of Waterville College.

Resolved, That there be, and hereby is, granted to Waterville College, to be paid out of the Treasury of the State, the sum of three thousand dollars; in equal annual payments, the first payment to be made on the first day of April next: Provided, That the sum of two hundred and fifty dollars, from the sum hereby granted, shall be appropriated, annually, to the partial or total reduction of the tuition fees of indigent students in said College. (Approved by the Governor, February 18, 1828.)"

*Resolves of Maine,* Vol. 1, P. 797, Chapter XXXV.

Without formal research we note the following resolves: 1829, c. 10, Waterville College, $1000; 1832, c. 100, same $1000; 1831, c. 69, and 1835, c. 63, Maine Wesleyan Seminary, $2000 and $1000; 1833, c. 74, Westbrook Seminary, $1000; 1833, P. 564, Resolve for the Improvement of Colleges in Maine.

Resolves of Maine, 1903, c. 91, P. 37 reads:

"Resolve in favor of Colby College.

Resolved, That there be and hereby is appropriated the sum of fifteen thousand dollars to be paid to Colby College for the use of said institution to enable it to rebuild and furnish its dormitory destroyed by fire in December last.

Approved March 28, 1903."

The Resolves of 1921, c. 155, 1927, c. 247, 1931, c. 141 granted substantial sums to academies, many of which were religious, and for broad purposes. See R. S., 1930, c. 19, § 105, Par. 2, R. S., 1954, c. 41, §§ 107, 125.

The Revised Statutes of 1954 contain provisions for the payment of public funds to "the trustees of any academy," etc., where there is no "free high school of standard grade" maintained. (Academies have a religious reference.) The so-called Sinclair Act of 1957 contains like provisions. R. S. (1954), c. 41, § 105: P. L., 1957, c. 142, § 3, c. 364, § 59 (special session), c. 443, § 17. See also R. S., c. 90-A, § 12, VII, B, P. L., 1957, c. 405, § 1.

*What would the appellants say of the legality of public bus transportation to an academy, of scholars where tuition is paid by the municipality?*

"Money raised for certain purposes. — The voters at a legal town meeting may raise the necessary sums for the support of schools and the poor; - - - *repairing and constructing buildings for academies, seminaries or institutes* with which the town has a contract as provided in section 105 of chapter 41" *(supra)*. (Emphasis supplied.)

R. S. (1954), c. 91, § 100.

Other statutes together with long tradition may be readily cited to manifest that Maine and its Constitution do not regard "the state and religion" as "aliens to each other - -

hostile, suspicious, and even unfriendly." *(Zorach* v. *Clauson, supra.)* R. S., c. 41, § 145, § 146; c. 134, § 33, § 34; c. 92, § 6 V; P. L., 1955, c. 399, §§ 10, 11, G; Preamble to Constitution; Marriage Laws, etc.

In view of the wording of Article VIII of the Maine Constitution and the record of direct grants thereunder by the Legislature for almost one century and a half, to several private religious institutions it is most difficult to conjure a doubt of the constitutionality of a mere publicly financed bus ride for a pupil attending a private or parochial school when such service has been sanctioned by the Legislature.

With the grant of legislative warrant of delegated authority there is no constitutional inhibition in Maine against a municipal ordinance which furnishes from general tax revenues to private school pupils free bus transportation to and from school.

The confusion of the present and like controversies will be greatly dissipated by a repetition here of the principles of some basic legal decisions restating precepts from the natural law antedating and persisting through both constitutions.

In 1923 the United States Supreme Court in the leading case of *Meyer* v. *Nebraska*, 262 U. S. 390 decided that a state law prohibiting the teaching of school subjects in any language other than English and the teaching of a foreign language below the 8th grade was unconstitutional.

> P. 401. "That the State may do much, go very far indeed, in order to improve the quality of its citizens, physically, mentally and morally is clear; but the individual has certain fundamental rights which must be respected. The protection of the Constitution extends to all, to those who speak other languages as well as to those born with English on their tongue. Perhaps it would be highly advantageous if all had ready understanding of our ordinary speech, but this cannot be coerced

by methods which conflict with the Constitution — a desirable end cannot be promoted by prohibited means."

P. 400. " - - - His right thus to teach and the right of parents to engage him so to instruct their children, we think, are within the liberty of the Amendment." (14th.)

In 1925 in an equally fundamental decision the U. S. Supreme Court in *Pierce* v. *Society of Sisters,* 268 U. S. 510, unanimously ruled that a state law requiring parents under penal alternative to send their children to public schools was unconstitutional because of the 14th Amendment.

P. 534. "No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare.

- - - - - - - -

"Under the doctrine of Meyer V. Nebraska, 262 U. S. 390, we think it entirely plain that the Act of 1922 unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control - - *The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."* (Emphasis supplied.)

The two decisions just cited above are to be read as companion cases and affirm the right of parents to control the education of their children, an "unalienable" right.

"The rights of children to exercise their religion and parents to give them religious training and to encourage them in the practice of religious belief, as against preponderant sentiment and assertion of state power voicing it, have had recognition here, most recently in West Virginia State Board of Education v. Barnette, 319 U. S. 624. Previously in Pierce v. Society of Sisters, 268 U. S. 510, the Court had sustained the parent's authority to provide religious with secular schooling, and the child's right to receive it, as against the state's requirement of attendance at public schools. And in Meyer v. Nebraska, 262 U. S. 390, children's rights to receive teaching in languages other than the nation's common tongue were guarded against the state's encroachment. *It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include separation for obligations the state can neither supply nor hinder.* Pierce v. Society of Sisters, supra. And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter."

(Emphasis supplied.) *Prince* v. *Commonwealth of Massachusetts* (1943), 321 U. S. 158, 165.

In 1927 in the case of *Farrington* v. *Tokushige,* 273 U. S. 284, the same highest court decreed that there are definite constitutional limits upon the power of a territory (Hawaii) to regulate private schools and that such is true although the territorial lawmaking body may strongly assert that such regulation is necessary to promote educational welfare.

Since the decision of *Farrington* v. *Tokushige, supra,* a significant development and change have occurred in constitutional law. That opinion was rendered at a time when the first 8 amendments were interpreted as applicable only to the Federal Government. One who found himself aggrieved was not regarded as free to invoke those amend-

ments to the U. S. Constitution in order to deter a State from discriminatory practices. It was necessary for such person to depend upon the generalized provisions of the 14th Amendment. In several decisions the U. S. Government subsequently, however, has decided that the principles of the first 8 amendments do restrain the States as well as the Federal Government, recognizing that those amendments possess the additional quality of being natural rights of the individual, pleadable against the States. (See, *Palko* v. *Connecticut*, 1937, 302 U. S. 319, 326.) Many of the cases involved Jehovah's Witnesses and the court applied the doctrine that the word, liberty, in the 14th Amendment includes liberty in Amendment 1. Some of the vagueness and generality of the 14th Amendment now give way to the specific provisions of Amendment 1 in religious liberty controversies. The U. S. Supreme Court made these important observations and distinctions:

"In weighing arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for transmitting the principles of the First Amendment and those cases in which it is applied for its own sake. The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard. *The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedom of* speech and of press, of assembly, and *of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect. It is important to note that while it is the Fourteenth Amendment which bears di-*

*rectly upon the State it is the more specific limiting principles of First Amendment that finally govern the case."* (Emphasis supplied.)

*Board of Education* v. *Barnette* (1942), 319 U. S. 624, 639.

Freedom of religion and from restraints in the exercise thereof will thus appear as primordial. The status of the parochial school has been secured beyond peradventure.

The foregoing decisions are bastions against possible evolution toward a totalitarian state where children are regimented, indoctrinated and freedom withers and dies. They guarantee diversities which are so characteristic of our Republic.

"- - - Compulsory unification of opinion achieves only the uniformity of the graveyard."

*Board of Education* v. *Barnette, supra,* P. 641.

When, then, parents in this State and land send their children to private or parochial schools they are not acting by the sufferance of anybody.

When parents, not for better teaching or for desired social prestige but in conscience, are convinced that secular education is not sufficient for their children, schools are required where along with the cultivation of mere intellectual virtues are inculcated knowledge of man's transcendent destiny and efforts to help him attain it. Along with their conviction that children are inseparable from God and not humanistically self-sufficient these parents hold that a comprehensive idea of anything is impossible without reference to the Creator in Whom all things begin, are conserved and end. The State laws can and do properly require of the private and religious schools that they teach the legally standardized secular subjects. Religiously the parents are acting under moral compulsion in patronizing parochial

schools. When to that severe stricture is added the also proper but drastic and well enforced truancy laws of our State (R. S., 1954, c. 41, §§ 91, 92, 94, 95, 97; P. L., 1957, c. 364, §§ 47, 48, 50, 51, 52) then such parents are truly constrained to send their children to religious schools. There are the Charybdis of conscience and the Scylla of penal law. It becomes not an affair of luxury, perversity, social ambition or idiosyncrasy but truly one *de rigueur.*

It is not considerate or fair to exact of such parents that they avail themselves of all of the public school facilities or of none. They are in a position to take very few. They are obliged by our law to place their children physically in school. Since they are economically a cross section of citizens; many of them cannot afford a vehicle. By indirection they may be forced to yield their natural rights and abandon their cherished schools for want of transportation in modern traffic. What then become of the admonitions of the First Amendment to the U. S. Constitution against prohibiting the free exercise of religion and of Article 1, Section 3 of the Maine Constitution against hurting one in his liberty or estate for worshipping God in the manner and season most agreeable to the dictates of his conscience or for his religious professions or sentiments?

> " - - - Freedom of speech, freedom of the press, *freedom of religion* are available to all, not merely to those who can pay their own way." *Murdock* v. *Pennsylvania* (1942), 319 U. S. 105, 111.

When the Legislature passes specific laws relating to public and fewer to private schools the explanation is that some laws it cannot enact for private educational institutions *(Pierce* v. *Society of Sisters, supra)* and others it has no occasion to make.

> " - - - it shall be their (Legislature's) duty to *require* the several towns to make suitable provisions

at their own expense for the support and mainte-
nance of *public* schools." (Emphasis ours.)

*Constitution of Maine*, Article VIII.

That is a positive mandate and the Legislature has dili-
gently honored it. But if the Legislature has limited its en-
actments for private schools to proper minimal standards
of secular education, compulsory attendance, etc., there is
thus justified no implication that the Legislature is callous
toward such private schools or altogether impotent. On the
contrary, in accord with the spirit and wording of Article
VIII, the Legislature must always be gratified with the pro-
motion of learning and "a general diffusion of the advan-
tages of education" through all schools. We cannot infer
that the Legislature is opposed to justifiable police power
provisions for private school scholars. When the Legis-
lature provides for public school transportation it is not
functioning under Article VIII but by virtue of the police
power of the Preamble of our Constitution.

Exercise of the police power by the Legislature on be-
half of public school children whom it is constitutionally
charged with educating in no way by any known rule of
reason or legal osmosis precludes, preempts or discredits
the exercise by a municipality of its legislative, endowed
police power for private school children whose parents must
educate them. To hold to the contrary is to maintain that
because the Legislature sought to protect public school
children while it was conforming with the positive con-
stitutional mandate to educate them it demonstrated by a
prohibitory inference that it entertained no humane regard
for private school pupils and suspended the police power of
the City in this one instance. Such thinking is not only
illogical, it is uncharitable.

The Legislature has committed the administration of
public school funds and of public school bus transportation

to the supervision and control of the department of education. So it did, as well, by its charter to the City of Augusta. As for bus transportation the allocation to such department was but a matter of convenience. Even to public school pupils transportation is not an inherent, indispensable or integral part of the public schools as such. Bus transportation is not to be apostrophized and given a content of instruction. It is not of the essence of the public school which could and has functioned without transportation. The private and parochial schools have always had to endure without public bus transportation, although the parents of the pupils contribute to support it, and by the very stipulation in this case it is conceded that those private schools educate very well. If public bus transportation is essential to the public, it is for the private school. The Legislature without sensible privation to the public schools could assign the public transportation facility to the police, traffic safety or health department, etc. Transportation acquires no change in nature, no teaching faculties or qualities because it is under the jurisdiction of the education department. Transportation is propulsion, not learning. It is a physical process of moving children through space without appreciable contribution to the education of the children in transitu. Buses carry no black boards or instructing teachers. Bus transportation is an adjunct accommodation entirely in the exercise of police power applied for child safety and health and for school efficiency.

Amongst other challenges to the ordinance in this case, the appellants argue that an appropriation to supply publicly paid transportation for private school pupils is a "school" appropriation. As we have already observed such is true only in a manner of purely convenient reference. Such an appropriation is the exercise of police power and social welfare and not teaching. Appellants contend that the charter of the City of Augusta and the statutes make

no provision for delegating to the City authority to make such a "school" appropriation. That cannot be sound unless the appellants further dispute the rudimentary authority of the City of Augusta to appropriate for public safety, health and welfare.

Police power is a prerequisite of government. Order and police power are correlative terms. Public health, safety and welfare are indispensable to human society and their achievement is the highest duty of government. *R. R. Co.* v. *Commissioners,* 79 Me. 386; *State* v. *Starkey,* 112 Me. 8.

> "This power must be extensive enough to protect the most retiring citizen in the most obscure walks, and to control the greatest and wealthiest corporations. - - - 'This police power of the state extends to the protection of the lives, limbs, health, comfort and quiet of all persons and the protection of all property within the state' Thorpe v. Rutland Railroad Co., 27 Vt. 150 - - -"

*R. R. Co.* v. *Commissioners, supra,* P. 393.

> "With the Legislature the maxim of the law 'salus populi suprema lex' should not be disregarded."

*State* v. *Noyes,* 47 Me. 189, 211.

The Legislature by charter delegated to the City of Augusta police power for that community:

> "The inhabitants of the town of Augusta - - - a body politic - - - and as such shall have, exercise and enjoy all the rights, immunities, powers, privileges and franchises, and be subject to all the duties and obligations now appertaining to, or incumbent upon said town as a municipal corporation, or appertaining to or incumbent upon the inhabitants or selectmen thereof; and *may ordain and publish such acts, laws and regulations not inconsistent with the constitution and laws of this state, as shall be needful to the good order of said body politic;* - - - -" (Emphasis supplied.)

P. L., 1919, c. 75, § 1.

The "good order of said body politic" connotes a tranquil disposition of affairs, a multitude reduced in some wise to unity.

We have examined all 37 sections of Augusta's charter. (P. L., 1919, c. 75.) With few exceptions of no moment here, all of the police power delegated to that City is contained in Section 1, *supra*, in the expression, "good order." It is a compelling sequitur, therefore, that "good order" must signify "health, safety and welfare" or that the City was projected into being by the Legislature without the imperative authority of police power. The City of Augusta by its charter received plenary police power for its municipal existence. For sufferable existence the safety, health and welfare of its children are paramount and there is nothing inconsistent with the Constitution or laws of Maine or with the Legislative mind in the weal of children.

Our court in an advisory opinion has said:

"The ordinary form of a city charter granting authority to enact ordinances not inconsistent with the Constitution and laws of the State is a delegation of authority to exercise the police power." *Opinion of the Justices*, 124 Me. 508, 509.

" - - - The state legislature, in order to obviate the difficulty of making specific enumeration of all powers it intends to delegate to the municipality, usually confers some power in general terms - - - - Special charters are often concluded with a clause conferring general authority to pass all ordinances which may be necessary for the promotion of the health, safety and welfare of the municipality which are not in conflict with the constitution or general laws of the state - - - -"

Rhyne: Municipal Law (1957), P. 72.

" - - - The city is a miniature State, the council is its legislature, the charter is its constitution; and it is enough if, in that, the power is granted in

general terms, for when granted, it must neces-
sarily be exercised subject to all limitations im-
posed by constitutional provisions, and the power
to prescribe the mode of its exercise is, except as
restricted, subject to the legislative discretion of
the council. - - -"

*Paulsen* v. *Portland* (1893), 149 U. S. 30, 38.

"The difficulty of making specific enumeration of
all such powers as the Legislature may intend to
delegate to municipal corporations renders it nec-
essary to confer some power in general terms - - -"

*Porter* v. *Vinzant* (1905), 49 Fla. 213, 38 So. 607,
608.

" - - - A general grant of power to enact all ordi-
nances, in addition to those enumerated, for the
promotion of municipal police and sanitary affairs,
order, industry, commerce and general welfare,
is generally, though not always, considered to give
authority to enact ordinances upon all other sub-
jects within the scope of municipal jurisdiction
which are not mentioned in the specific enumer-
ation - - - -"

McQuillin: Municipal Corporations, 3rd ed., Vol.
5, § 16.09, P. 173.

There is very doubtful merit in an assertion that when
the Legislature granted police power to Augusta it was not
"foreseeable" that a time would come when commerce and
traffic would make it advisable to exercise such power for
the health, safety and welfare of city children.

We have found no authority that police power grants are
strictly construed albeit ordinances thereunder must be
reasonable.

The general statutes of this State have conferred police
power upon all municipalities:

"Towns, cities, village corporations may make by-
laws or ordinances, not inconsistent with law, and

enforce them by suitable penalties, for the purposes and with the limitations following:

II. For establishing police regulations, - - - and preservation of good order - - -

III. Respecting - - - health."

R. S. (1954), c. 91, § 86.

Moneys raised and appropriated for enforcement of police power regulations are authorized by the clause:

"and for other necessary town charges."

R. S. (1954), c. 91, § 100.

The term, "police regulations" as employed in II, above, is not limited to the "police force";

" 'Laws and ordinances relating to the safety, comfort, health, convenience, good order, and general welfare of the inhabitants are styled 'police regulations'."

*Dantzler Lumber Co.* v. *Texas Ry. Co.* (1919), 119 Miss. 328, 80 So. 770, 776. See, Words and Phrases, Per. Ed., Vol. 32 A. P. 479.

"Police Regulation. The term is used to define a power which resides in the state. In its primary or narrow sense it refers to the exercise of the police power to protect the health, lives and morals of the people. In its broader acceptation it embraces everything to promote the general welfare; everything essential to the great public needs. In the plural, such provisions of law as are designed to protect the lives, limbs, health, comfort and quiet of citizens and to secure them in the enjoyment of their property; regulations adopted in the exercise of 'police power'."

72 *Corpus Juris Secundum*, P. 207.

Before the enactment of the Augusta ordinance the 1957 Legislature adopted a revision of the municipal laws, to

take effect in August, 1957. That revision will be effective during the life of the Augusta ordinance and the spending of the money appropriated. It reveals a very liberal attitude toward municipal police power.

In 1955 the Legislature authorized the Attorney General and a committee of his forming to study municipal laws and to report to the 1957 Legislature such changes and amendments as were calculated to consolidate and complete such laws so as "to eliminate archaic and contradictory provisions" and "to make such statutes more readily understandable and useful to the municipalities and persons affected thereby." P. & S., 1955, c. 214.

In 1957 to the 98th Legislature the incumbent Attorney General forwarded a proposed revision of our municipal laws prepared by him and his committee in response to the legislative directive of 1955. With such suggested revision the Attorney General sent a letter to the Legislature advising:

> "The work sheets in this report give a complete explanation of the changes made and the reasons for them - - - -"

Page 40 of those work sheets treating of R. S. (1954), c. 91, § 86, II, III, cited *supra,* is partially reproduced as follows:

> "**II.** ~~For establishing police regulations, for the prevention of crime, protection of property and preservation of good order, and to regulate the use and manner of the use of bicycles in the streets~~. **Promoting the general welfare; - - - providing for the public safety.**
>
> *Comment:*
>
> This becomes the first and last parts of N S 3 1 A
>
> 'Police regulations' deleted.

*This subsection is a general statement of police power. 'Promoting the general welfare,' which* includes 'prudential affairs' taken from Sec. 86 I, *is a general statement following the language of the Federal Constitution. Along with 'providing for the public safety,' it expresses a broad general power* which includes 'prevention of crime, protection of property, and preservation of good order.' (Italics added.)

"III. ~~Respecting~~ - - - **preventing** ~~infections~~ disease and **promoting** health - - - -"

*Comment:*

This becomes the middle part of N S 3 1 A."

In accordance with the Attorndey General's model the Legislature enacted a revision as follows:

"Sec. 3. **Police power ordinances.** A municipality may enact police power ordinances for the following purposes:

I. General.

A. *Promoting the general welfare:* preventing disease and *promoting health: providing for the public safety."* (Emphasis supplied.)

P. L., 1957, c. 405, R. S., c. 90-A.

By appropriating the phrase, "Promoting the general welfare," which occurs in the very preamble of the United States Constitution and serves as the basis of the police power in our National Government the Legislation gave evidence of willing that the police power of municipalities be broad.

The 1957 Legislature granted authority to municipalities to appropriate money for police power:

"Municipal Finance

Sec. 12. **Purposes for which money may be raised or appropriated.** A municipality may raise or appropriate money for the following purposes:

VIII.   General.

A.   Performing any of the duties required of it by law.

B.   Providing for any operations authorized by law which, by their nature, require the expenditure of money."

P. L., 1957, c. 405, R. S., c. 90-A.

"A general welfare or similar clause granting extremely broad power to a municipal corporation, is liberally construed to accord to a municipality wide discretion in the exercise of police power. The cases, indeed, reveal an increasing judicial inclination under such a clause to accord to municipal authorities wider discretion in the reasonable and nondiscriminating exercise, in good faith, of the police power in the public interest. - - - -"

McQuillin: Municipal Corporations, Vol. 6, § 24, 44, P. 535.

For the evaluation of police power ordinances this court has adopted a criterion:

"In Jones v. Sanford, 66 Maine, page 589, (1877) the late Chief Justice Peters, speaking of the authority of the court to pass upon the question of reasonableness of a by-law or local ordinance said: 'This principle does not apply, where that is done by a municipal corporation which is directly authorized to be done by the legislature. But where the power granted is a general one, the ordinance passed in pursuance of it, must be a reasonable one of the power or it is invalid.' "

*State* v. *Mayo,* 106 Me. 62.

By charter and by statute police power has been delegated to the City of Augusta. It remains for us to estimate the reasonableness or want of it in the ordinance passed.

The presumption is in favor of the ordinance.

"The ordinance, however, should be viewed as a whole, in the light of the purpose for which it was enacted *and with the presumption that it was not the intent of the enacting body to exceed its authority.*" (Emphasis supplied.)

*State* v. *Brown* (1920), 119 Me. 455, 456.

" - - - Hence, an ordinance which plainly purports to be enacted in the interest of public health, safety or welfare is presumed valid and enacted in good faith, and may be declared invalid only when it clearly appears that the ordinance does not tend in an appreciable degree to that end and that the power to legislate has been exercised arbitrarily in the enactment of an ordinance which is plainly unreasonable. Good faith in the enactment of an ordinance is presumed - - - -"

McQuillin: Municipal Corporations, Vol. 5, Sec. 15.23, P. 109.

As to the burden of proof:

"- - - the burden is on the objecting party to overcome this presumption."

*State* v. *Small* (1927), 126 Me. 235, 237.

The ordinance is not discriminatory.

" - - - 'Such laws as the act in question have never been regarded as class legislation simply because they affect one class and not another inasmuch as they affect all members of the same class alike, and the classification involved in the law is founded upon a reasonable basis. If these laws be otherwise unabjectionable all that can be required in these cases is that they be general in their application to the class or locality to which they apply, and they are then public in character, and of their propriety and policy the Legislature must judge.' - - -"

*State* v. *Phillips* (1910), 107 Me. 249, 256.

Discrimination, if any, must be expressed:

" 'The motive of the framers to discriminate against a certain class which does not appear from

the language of the ordinance or statute will not make the enactment void or unconstitutional.' Soon Hing v. Crowley, 113 U. S. 709 - - -"

*Skowhegan* v. *Heselton* (1917), 117 Me. 17, 20.

The ordinance does not attempt to utilize inaccessible public school appropriations but provides its own appropriation from general tax revenues.

The enactment acknowledges the factor of compulsion in school attendance and the resulting dilemma of parents affected. It humanely consults the safety and health of those elementary school pupils attending non-governmental schools who reside more than a mile from such institutions. The distance fixed is not at all arbitrary but judicious in consideration of city and suburban traffic and the age of the scholars. The avowed interest in the health, safety and welfare of the children is a matter of the worthiest solicitude and of the highest concern to the State of Maine in its most precious product. The apprehension displayed is entirely justified.

"Further with reference to a test of reasonableness, it variously has been stated that the reasonableness of an ordinance is to be determined in the light of its purpose as an entirety, the remedy in view, and the complexity and dangerous conditions of the modern crowded city; that the court must regard the conditions prevailing in the city or town bearing directly on the subject matter, the object sought to be attained and the need, propriety or desirability of the legislation, and that 'to arrive at a correct decision whether the by-law be reasonable or not, regard must be had to its object and necessity' - - -"

McQuillin: Municipal Corporations, Vol. 5, § 18.06, P. 398.

The Superintendent of the Public Schools of Augusta testified in this case. He ultimately resolved his doubt that school bus transportation is in any considerable degree a

concession to safety apprehension for the children served. As to the motivation of safeguarding health he did not voice such inceptive misgivings. For the reasonableness of the ordinance just health protection would seem ample. *State* v. *Maheu,* 115 Me. 316, 318. However, this court will take judicial notice that safety, these days is a prime justification for the transportation.

> "Facts which all persons of ordinary intelligence are presumed to know, need not be proved. State v. Kelley, 129 Me. 8."
>
> *Torrey* v. *Cong. Sq. Hotel Co.* (1950), 145 Me. 234.

> "In determining whether or not there is any credible evidence in a record from which a certain conclusion may be drawn, a court is not precluded from bringing to bear and applying to the problem that sound common sense which is derived from living in a world populated by human beings, and the observation and knowledge of their actions and reactions in and to situations encountered in the ordinary conduct of human affairs. 'Judges are not necessarily ignorant in court of what everybody else, and they themselves out of court, are familiar with; and there is no reason why they should pretend to be more ignorant than the rest of mankind." Applied Enterprises v. Walker, 5 Atl. (2nd) Del. 257, 261. This principle is as applicable to justices of the Law Court as it is to justices at nisi pruis. It is also applicable to referees. It not only may, but should be applied in determining what conclusions should be drawn from existing facts."
>
> *Melanson* v. *Reed Bros.* (1950), 146 Me. 16.

The appellants in their brief quote with approval:

> "Emphasis upon consolidation of rural schools in the past thirty years has made necessary the transportation of pupils *to avoid traffic hazards on the highway,* and indeed to make consolidated schools possible. - - -" (Emphasis supplied.)
>
> *National Education Association Bulletin,* Volume XXXIV, No. 4, December, 1956, P. 188.

The Kentucky Court in 1945 found that in its jurisdiction:

"- - - the hazards and dangers of the highway" (had) "increased a thousandfold from what they formerly were, - - -"

*Nichols v. Henry* (1945), 301 Ky. 434, 191 S. W. (2nd) 390.

It is a matter of universal information in mechanized America that for a lifetime there has been road improvement throughout by the States and Federal Government. Through their highway departments all States have striven vigorously to eliminate grade crossings, intersections and such in the ever accelerating traffic. So the school authorities and districts as instrumentalities of the States have collaborated for the progressive reduction of highway hazards by the means of programs of school bus transportation. One of the finest practices and customs of the American people is its tender and diligent safeguarding from traffic of most of its school children. In logic and in equity and in distributive justice that public service must be extended to all school children.

In August, 1958 the Chief of the Maine State Police issued a public warning to the public school pupil who missed his school bus.

That official was thus quoted:

" - - - There are times, for one reason or another, when a youngster will miss the bus. This means, in some instances, that he must walk two or three miles to his home. *Of course, we constantly warn him to walk on the lefthand side of the road, if there are no sidewalks, and to be prepared to scramble into the ditch, if necessary, to avoid being struck by a car.*

"However, we wish, also to warn him against another very real danger. The case files of our criminal bureau carry many records of youngsters who

made the mistake of getting into a car with a stranger. Some of them were never seen again.

"I cannot stress this point too strongly. It is far, far better to walk all the way home than it is to accept a ride from a person you do not know." (Emphasis supplied.)

(*Portland Sunday Telegram*, August 17, 1958.)

The head of our State Police entertains judgments differing somewhat in their emphasis and intensity from those of the Superintendent of Public Schools.

The apprehensions of the Chief of the State Police are foreboding to the children attending standardized non-government schools under moral and legal compulsion and to their parents but those children save for an ordinance similar to the Augusta enactment must "miss the bus" which their parents must help to support.

Our winters are long and cold. Daylight hours are then at a minimum. Sidewalks are often non-existent or impassable for snow and ice. Health is jeopardized. The alertness of children may vary with fatigue, distraction, the quality or state of natural reflexes and with the obliviousness of wholesome play. School hours can leave exhaustion.

Education is the mental training of citizens who are under the disability of infancy. That disability persists although the child is attending a private elementary school.

A national scourge is motor casualties. For 1957 and 1958 these are official statistics of our State which is comparatively small in population amongst other States:

## 1957

| Age Group | Persons Killed | (Pedestrians) | Persons Injured | (Pedestrians) | (Bicycles) |
|---|---|---|---|---|---|
| 0 - 4 | 7 | 5 | 268 | 94 | 3 |
| 5 - 9 | 13 | 10 | 377 | 184 | 28 |
| 10 - 14 | 5 | 3 | 358 | 64 | 56 |
| 15 - 19 | 17 | 1 | 929 | 18 | 7 |
| | 42 | 19 | 1932 | 360 | 94 |

## 1958

| | | | | |
|---|---|---|---|---|
| 0 - 4 | 15 | 6 | 296 | 77 | 4 |
| 5 - 9 | 14 | 7 | 622 | 228 | 41 |
| 10 - 14 | 10 | 2 | 401 | 59 | 24 |
| 15 - 19 | 18 | 1 | 985 | 22 | 2 |
| | 57 | 16 | 2304 | 386 | 71 |

The ubiquity in Maine and the nation of the "Slow - - - School" signs is eloquent of the consciousness of the public mind as to the danger lurking for all school children.

It is a not uncommon mistake to judge issues concerning children upon the same premises and by the same standards applicable to adults. Such is true with regard to youngsters walking considerable distances to school in severe climatic conditions and along busy highways.

Children are especial predilections of the police power.

> "The state's authority over children's activities is broader than over like activities of adults.
>
> " - - - A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies - - -
>
> "It is true children have rights, in common with older people, in the primary use, of highways. But even in such use streets afford dangers for them not affecting adults - - -"
>
> *Prince* v. *Commonwealth of Massachusetts* (1943), 321 U. S. 158, 168, 169.

The City of Augusta appears to have acted with considerable reason in its ordinance for child health and safety. The objective and the remedy applied give a sanction to the enactment within the delegated authority of the Legislature whether that sanction be justified as "good order of said body politic," "establishing police regulations - - - and preservation of good order" or "promoting the general welfare" or, in other words, whether we look to the charter or the statutes for its basis.

It would have been very extraordinary if the young Abraham Lincoln or Franklin D. Roosevelt had encountered traffic-hazards on his way to school. Appellants aver that ordinances such as that of Augusta are a new departure in Maine and therefore must be adjudged as wanting in authentication from the Legislature. The ordinance here is novel but that is not a valid indictment, if it is necessary, reasonable and an exercise of police power.

> " - - - Its exercise (the exercise of the police power) must become wider, more varied and frequent, with the progress of society - - -"

*Boston & Maine Railroad Co.* v. *County Commissioners* (1887), 79 Me. 386, 393.

Police power can not be static. It must be adaptable, resourceful and vigilant. The law exists for the people, not people for the law.

> " - - - this power is not something which is rigid and definitely fixed; on the contrary, in its very nature it must be considerably elastic within limits in order to meet the changing and shifting conditions which from time to time arise through the increase and shift of population and the flux and complexity of commercial and social relations. In other words, the police power is dynamic in character; by virtue of fundamental principles, not to be defined with inexorable and mathematical certainty but nevertheless inherent and fundamental in government, it copes with the new as it has with the old and justifies measures in the present that it has not justified in the past. - - - -"

McQuillin: Municipal Corporations, Vol. 6, 3rd ed., § 24.03, P. 445.

The ordinance responds to a purely modern exigency, traffic disasters in alarming arithmetic progression. It conforms to the more sympathetic preoccupancy with mass health. Our age differs from those immediately preceding it because of our acceptance of social concepts as contrasted

with the individualistic attitudes of other times. Rapid developments in social, political and economic life produce an always increasing complexity of society and broaden the social service field. School children have welfare needs not known before. Public welfare measures are indispensable and are now commonly adopted in the more populous States of this day. The law has clearly placed its emphasis on persons rather than property.

From an economic standpoint the ordinance is reasonable. Such is cumulatively true. It is not of prime consequence in view of the human values involved here. The appellants, however, presented testimony estimating the annual cost of the private school transportation supplied by the ordinance at a figure between $7,000 and $8,000. The State Department of Education has records establishing that, without inclusion of certain capital plant charges or debt service costs, the outlay for each of the years, 1957 and 1958, per average daily membership for each public elementary school pupil was $227. Upon multiplication it will appear that, without cost to the city and at an annual saving of $200,000 plus, the private schools are providing standardized and successful secular education to young citizens of Augusta. By its ordinance the city can hardly be adjudged improvident. Of truer consequence and aside from the foregoing the city is worthily endeavoring to conserve the health and safety of one third (308) of a child asset beyond price.

The Augusta city ordinance infringes upon neither the United States nor the Maine Constitution. Sufficient authority has been delegated to the city by the Legislature for enactment of this law, by both charter and statutes. The act is reasonable by all applicable standards. By judicial precedent, by statistics and from common experience of life the act is necessary. It is just and equitable. Under such circumstances there can be no justification for postu-

lating an isolated exception to public safety responsibility, suspending the police power and frustrating the impotent city. By so doing we would be creating bothersome variants in the law. How embarrassing and self conscious for a child citizen trudging to a private school to find himself in throbbing traffic where the policeman must be judiciously discriminating. We take it that the policeman might lead the child. He might carry the child unto "piggybacking." But in a police safety car the officer might not succour the child who has not already been injured, perhaps, for a police car is too closely related and akin to the non-legal school bus. The patrolman in his private car might transport an uninjured child to private school. The child's parents may in their own car. The public school bus is out of bounds for the private school pupil even were his parents to have saved their tax receipts for the current year. Therefore the officer might have to continue walking as must the child. There are no more mounted policemen. Let the child all the while keep the truant officer in mind. We could extend the nondescript situation further. We could wonder more about the status for public bus transportation of the pupil attending a religious academy and whose tuition is paid by the municipality. We can not blame the Legislature which has functioned adequately. There can be no true distinction amongst children as to their eligibility for public bus transportation because some attend private schools which are not tax supported and whose curriculum affords secular education with the eternal verities.

The ordinance has legislative sanction and is valid.

DUBORD, J.   (Supplemental Dissent)

The purpose of this supplemental opinion is to pin point and emphasize some of the important aspects of the case before us.

Even though a person may be a judge, his intellect is not impervious to knowledge of matters commonly known by all the people of a community. I am, therefore, not without awareness of the controversy which prevailed in the City of Augusta a few years ago just previous to the enactment of the ordinance now under consideration. This controversy involved the issue of the conveyance of parochial school children, and in order that the citizens of Augusta might have an opportunity to express their opinion upon the issue there was submitted to them the following question:

"Shall the City of Augusta appropriate funds for transportation of parochial school students?"

It is a matter of public record that on December 10, 1956, upon the question submitted, the people declared its affirmative plebiscite by a vote of 3915 to 2470.

Pursuant to the plebiscite of the people, the City Council of the City of Augusta, solicitous for the safety and welfare of all elementary school children, very wisely enacted an ordinance authorizing appropriations for the conveyance of such children to the private schools of the choice of their parents. This action, on the part of the Augusta City Council, is authorized under the police power of the City of Augusta, both under the provisions of the Augusta City Charter and Chapter 405, Public Laws of 1957.

Then followed the institution of the instant action by thirteen protagonists of the opponents. In order that the names of these thirteen persons may go into the records permanently, and not be lost in the anonymity of a title such as Alden W. Squires, et al. v. The Inhabitants of the City of Augusta, et al., let it be recorded that their names and occupations are as follows: Alden W. Squires, Physician, Veterans Administration, Togus, Maine; Rev. Harvey F. Ammerman, Pastor South Parish Congregational Church, Augusta, Maine; F. Herbert Bailey, Bridge Engi-

neer, State Highway Department; Franklin C. Brawn, Civil Engineer, State Highway Department; Kervin C. Ellis, employed at the Veterans Administration, Togus, Maine; Donald E. Hayward, Dentist, Veterans Administration, Togus, Maine; Trygve Heistad, General Agent Northwestern Mutual Life Insurance Company; Leslie G. Hilton, Bank Examiner; Robert E. Kinsey, General Manager, Gardiner Paper Mills; Albert E. Smith, Director of Sales Promotion, Central Maine Power Company, Augusta, Maine; William W. Sprague, Real Estate and Insurance; Stanley E. Sproul, Lumber Dealer; and Dorothy Tozier, Social Worker, Augusta State Hospital.

I write this opinion with genuine sorrow for the thousands of young innocent boys and girls, who, as a result of the majority opinion will be denied the safety of transportation to the schools which they attend. From any impending result I absolve myself of responsibility.

The instant bill in equity, was instituted largely upon the theory that the ordinance and vote of the City Council of the City of Augusta appropriating money for conveyance of parochial school children was repugnant to the Constitutions of the State of Maine and of the United States of America, in that they constituted a preference of one sect or denomination and purported to be a law respecting an establishment of religion. The Superior Court Justice who heard the bill at the outset, basing his decision on the presumption of constitutionality, dismissed the bill and from this decision the plaintiffs appealed.

The Supreme Court of the United States has said in *Everson* v. *Board of Education,* 330 U. S. 1, that expenditures of public funds for the conveyance of private school pupils is not a violation of the Federal Constitution, nor do such expenditures constitute a preference of one religious sect or denomination. Such an edict constitutes the ultimate law of the land.

As to the assertion that the action of the City Council of the City of Augusta purports to be a law respecting an establishment of religion, such an allegation can be construed only as a plain absurdity.

Our associates who constitute the majority have seen fit to disregard the constitutional issues and have written their opinion upon the theory that the only issue is that of authority of the Augusta City Council under its police power.

If counsel for the appellants are aware of the provisions of the Constitution of Maine which relate to education, the statutes enacted pursuant thereto and the appropriations made by Maine Legislatures throughout the past 139 years in favor of academies and colleges, many of which were founded by religious sects, they have conveyed no such knowledge to the court.

Article VIII of the Constitution of Maine reads in part as follows:

> "A general diffusion of the advantages of education being essential to the preservation of the rights and liberties of the people; to promote this important object, the legislature are authorized, and it shall be their duty to require the several towns to make suitable provision, at their own expense, for the support and maintenance of public schools; *and it shall further be their duty to encourage and suitably endow, from time to time, as the circumstances of the people may authorize, all academies, colleges and seminaries of learning within the state.*" (Emphasis supplied.)

This constitutional provision, as well as several decisions of the Supreme Court of the United States, dispel the metaphorical fantasy of words such as "the wall between church and state," and "the separation of church and state."

No good American citizen desires to see the State united with any Church. However, we are a nation founded on a belief in God and with an abiding faith in a Divine Power, and certainly not hostile to religion.

Pursuant to constitutional authority, as cited above, the Legislature of Maine enacted what has been Section 100, Chapter 91, R. S., 1954 under which towns were authorized to repair and construct buildings for academies and seminaries. Section 100, Chapter 91, has now been repealed and superseded by Chapter 405, Public Laws of 1957. However, during the many years during which this statute was on our books, towns in Maine appropriated and spent money for direct aid to academies many of which had a religious foundation.

Article VIII of the Maine Constitution imposes a duty on the Legislature to "suitably endow" academies. To endow an academy means to make a gift to that academy and that is exactly what Maine Legislatures have done. Throughout the years money has been appropriated for the direct benefit of academies and colleges. In the volume containing the 1921 Public Laws and Resolves, will be found Chapter 160, which includes a long list of academies which were voted direct financial help, including some Roman Catholic institutions of learning, as well as many others with a religious foundation.

Attention is also called to Section 105, Chapter 41, R. S., 1954, which authorizes superintending school committees to contract with the trustees of academies for the schooling of pupils within their town, when no free high school is maintained. This provision has been carried over into Chapter 364, Public Laws of. 1957, known as the Sinclair Act, the constitutionality of which Act was given the stamp

of approval by this court on January 14, 1958. See *Opinion of the Justices,* 153 Me. 469. It is a matter of record that 21 different academies throughout the State of Maine have entered into contracts authorized by the foregoing section of the statutes and many of these academies have a religious foundation and background. Thus, direct financial help is given to institutions which are no less religious in character than are the parochial schools of Augusta.

As late as 1957, the 98th Maine Legislature appropriated $25,000.00 for Higgins Classical Institute to aid in building of a boys' dormitory to replace one which had been destroyed by fire.

Moreover, the same Legislature authorized Aroostook County to expend $10,000.00 for each year of the ensuing biennium for Ricker College.

Higgins Classical Institute was organized under the provisions of Chapter 91 of the 1891 Public Laws and one of its purposes is to promote Christian education.

Ricker College is a successor to Houlton Academy, which was organized by legislative authority in 1839 and among its corporate purposes is the promotion of piety and religion.

The record of these two institutions is outstanding in the field of education. There is no evidence of any opposition to these expenditures for such worthwhile purposes. However, the appropriations do constitute direct aid to institutions of learning which have a religious foundation. These facts are included in this opinion for the enlightenment of those who are without knowledge that such expenditures of public funds for direct aid to institutions of learning founded by religious sects are authorized and countenanced by the constitutional and statutory provisions of our State.

Perhaps the foregoing information may serve as a basis for contemplation on the part of those who fear that the conveyance of parochial school children at public expense violates the nebulous doctrine of separation of church and state.

In the light of constitutional and statutory authority in reference to such appropriations, how can it be argued that expenditures for the conveyance of little children to parochial schools is an unlawful diversion of public funds? No particular church or sect receives money, nor other gain therefrom. The children themselves are the only recipients of the accruing benefits. In any event the Supreme Court of the United States has furnished the answer and has said that such expenditures are lawful and constitutional.

The majority opinion recites that a municipality is without power to expend public funds for the conveyance of elementary school pupils from any other source except from public school appropriations. This conclusion is reached because they say the matter of conveyance of school children has been made a component part of the educational program by being included in a chapter of the statutes relating to education. Such reasoning is based upon an unsound premise and is unconvincing. It is impossible to operate schools without school buildings, teachers, text books and the necessary equipment, but schools can be operated, and have been operated without conveyance of the pupils.

Section 14, Chapter 41, R. S., 1954, is the section which directs superintendents of schools to procure the conveyance of elementary school pupils. This section says:

> "In all cases conveyance so provided shall conserve the comfort, safety, and welfare of the children conveyed."

Here is found the reason for conveyance, viz., the comfort, *safety and welfare* of the children, and this is exactly what the Augusta City Council endeavored to do in providing for conveyance of non-public school pupils.

It is a well-known fact, that many municipalities, including the City of Augusta furnish police officers at all schools, including parochial schools, to protect the children from traffic hazards while the pupils are crossing public highways on their way to and from school. What is the difference between spending money from a special appropriation to convey a child to a parochial school, except perhaps in the amount of the expenditure, and spending money appropriated for the police department, to protect parochial school children in the vicinity of the schools which they attend?

One may also ask if the conveyance of elementary school pupils to public schools is not for the protection of such pupils, as specified in the statute, what other purpose can it have?

Supposing there was not included in the chapter of our Revised Statutes specifically relating to education, a provision providing for the conveyance of elementary school pupils, I wonder if the appellants would argue, with any degree of vigor, that a municipality, for the purpose of conserving the safety and welfare of public school children, did not have the power to provide for their conveyance by a special appropriation not connected with a school appropriation?

The Augusta City Council provided in the ordinance before us for consideration, for the conveyance of all elementary school pupils who attend non-public schools, pursuant to and in conformity with the compulsory school attendance laws of the State of Maine; and in spelling out the

reason for the ordinance, the very words of Section 14, Chapter 41 were used viz., "to conserve the comfort, safety and welfare" of the children so transported.

The charter of the City of Augusta, in my opinion, authorizes this enactment. The charter gives the City of Augusta, the power "to ordain and publish such acts, laws and regulations not inconsistent with the Constitution and laws of this State as shall be needful to the good order of said body politic."

This court has said in *Opinion of the Justices*, 124 Me. 509:

> "The ordinary form of a city charter granting authority to enact ordinances not inconsistent with the constitution and laws of the State is a delegation of authority to exercise the police power."

The majority opinion cites this quotation with approval. What, one may ask, is there in the instant ordinance which is repugnant or inconsistent with the constitution and laws of our State? We have already seen that the Supreme Court of the United States has said that the expenditure contemplated by this ordinance presents no constitutional inconsistency. That being true, what statutes are there on our books which make the enactment of such an ordinance invalid? The answer is obvious. There are none.

It is pointed out in the main dissenting opinion that there is a tendency on the part of modern day courts to accord to municipal authorities wider discretion in the reasonable and nondiscriminatory exercise of the police power, in good faith, and in the public interest.

What is police power? According to Cooley, Const. 227 it is:

> "The authority to establish, for the intercourse of the several members of the body politic with each

other, those rules of good conduct and good neighborhood which are calculated to prevent a conflict of rights and to insure to each the uninterrupted enjoyment of his own, so far as is reasonably consistent with a corresponding enjoyment by others, is usually spoken of as the authority or power of police. This is a most comprehensive branch of sovereignty, extending as it does to every person, every public and private right, everything in the nature of property, every relation in the state, in society and in private life."

See also Section 942, Volume III, McQuillin on Municipal Corporations:

"It is a general rule, therefore, constantly applied that appropriate means to the exercise of the police power rest largely within the discretion of municipal authorities, and courts will not interpose unless the means employed amount to an unreasonable and oppressive interference with individual and property rights. Where the relation of the regulation to the police power is fairly debatable, ordinarily the court will not interfere." Section 947, Volume III, McQuillin on Municipal Corporations.

In 1957 the Legislature revised the general laws relating to municipalities. This is Chapter 405, Public Laws of 1957.

Section 3, of this new statute provides that a municipality may enact police power ordinances for the purpose of:

## I.

A. Promoting the general welfare; - - - - - - - - providing for the public safety.

In reference to this subsection the then incumbent Attorney General in his report to the Legislature prior to the enactment of the law said:

*"This subsection is a general statement of police power. 'Promoting the general welfare,' which in-*

*cludes 'prudential affairs' is a general statement
following the language of the Federal Constitu-
tion. Along with 'providing for the public safety,'
it expresses a broad general power."*

It is my opinion that the Augusta City Council, if it did
not already have the power under its charter, was given
direct authority to enact the ordinance now before us for
consideration, and to appropriate money to give effect
thereto.

In Chapter 405, Public Laws of 1957 under the heading
"Municipal Finance," by Section 12, subsection VII, a mu-
nicipality is given authority to raise and appropriate money
for *"providing for any operations authorized by law which,
by their nature, require the expenditure of money."*

This section gives the Augusta City Council definite and
positive legal warrant to appropriate and expend funds for
the administration of the ordinance which was enacted pur-
suant to its police power specifically delegated and author-
ized by the City Charter and by section 3, I, A of Chapter
405, *supra*.

The majority opinion says that Chapter 405, Public Laws
of 1957 is not a revision, but a mere consolidation. It re-
quires only a cursory study of the 1957 statute to discover
that this enactment is not a simple consolidation, but an
important revision of the laws relating to the powers of
municipalities. Section 100, Chapter 91, R. S., 1954, was
the statute which specified the purposes for which mu-
nicipalities could raise and appropriate money and the last
clause of this section read: "And for other necessary town
charges."

The majority opinion properly says that public funds
cannot be spent except for purposes authorized by law; and
then using the last clause of Section 100, Chapter 91, says
that the words "other necessary town charges" do not

constitute a new and distinct grant of indefinite and unlimited power to raise money for any purpose whatsoever at the will and pleasure of a majority. Apparently the fact that Section 100, Chapter 91, R. S., 1954 was repealed by Chapter 405, Public Laws of 1957 was overlooked.

I agree thoroughly with the statement of the law to the effect that money derived from taxation, in order to be legally expended, must be made available by lawful appropriations and that public funds cannot be spent except for purposes authorized by law.

However, I am convinced that the provisions of Chapter 405, Public Laws of 1957 cited above definitely and specifically authorize the City of Augusta to appropriate and expend money from a special fund for the conveyance of private school pupils.

The appropriation made by the Augusta City Council and under attack by the appellants herein, was a lawful appropriation. It is not necessary that the legislature specifically denote by statute all of the multiple purposes for which a municipality may raise or expend public funds. Under the broad general police power accorded by its charter, now confirmed by Chapter 405, Public Laws of 1957, the Augusta City Council acted within its delegated authority. The very fact that the Legislature repealed the clause, "and for other necessary town charges," which clause has been limited in the scope of its application, by various decisions of this court, is strong evidence that it was the intent of the Legislature to remove from the prior existing statute, any restriction contained therein.

In the interpretation of statutes there are, of course, certain applicable rules, and the fundamental rule of construction is legislative intent. However, the interpretation of such intent is but the composite opinion of the individual

thinking of those who constitute the court. In other words a statute means what a majority of the court says it means, and it is not difficult to find in the statute before us for consideration, legislative authority for the exercise of police power for the protection and safety of young children who happen to attend a private school, and who like all other children in America are entitled to the equal rights ordained in the Preambles of the Constitution of the United States of America and of the State of Maine.

In the instant case the words of the empowering statute are simple and plain. Interpretation thereof presents no unusual difficulties. Divorced from the specious argument that a municipality cannot provide by special appropriation for the conveyance of elementary school children who attend a private school, because such authority is not included in the body of statutes relating to education, the legislative intent is manifest and clear.

To find legislative authority in support of the ordinance in question we do not have to read words into the statute. All the necessary words are present.

It is assumed that the majority concedes that properly authorized municipal expenditures for the conveyance of pupils to private schools, not operated for profit, are legal and not inconsistent with constitutional limitations or restrictions, and that such expenditures do not constitute direct aid to the religious sect which is operating such schools.

Under the rule laid down by this very court in *Opinion of the Justices*, 124 Me. 509, the Augusta City Council had charter authority, in the exercise of its police power, to enact the ordinance which is now under question. This authority has been confirmed and strengthened by the provisions of Chapter 405, Public Laws of 1957.

The ordinance, and the appropriation made pursuant thereto, are a valid exercise of delegated power.

The majority suggests the need of further legislation. Unfortunately this decision will bring to naught the efforts which seek to conserve the safety and welfare of elementary school pupils in Augusta, and will nullify the laudable efforts of many other communities of our State, which are now providing, without objection, for the conveyance of elementary school pupils who attend private non-profit schools. In the meantime, the consequences, initiated by the plaintiffs herein, will descend on little children. Such a course of action must be without my sanction.

Delay is unnecessary. Substantive and authoritative warrant of law to support the ordinance before us is already in existence.

The bill should be dismissed.