RALPH M. LUNN et als., In Equity, vs. THE CITY OF AUBURN et als.

Androscoggin.   Opinion February 17, 1913.

*Approval. Bill in Equity. City Charter. City Council. Demurrer. Injunction.
Public Laws of 1909, Chapter 88.   Superintending
School Committee.   Schoolhouse.*

1.  The city council of the city of Auburn is in no sense a school committee and can perform none of the functions of that body, except by special grant of the Legislature.
2.  The provisions of Section 2, Chapter 88 of Public Laws of 1909 does not enlarge the powers and duties of the city council, but does confer upon the school committee all the additional powers and duties prescribed therein.
3.  That the words "care and management," as used in the city charter of the city of Auburn, continued in the superintending school committee of the city of Auburn the power and duty of approving the plans and specifications for any schoolhouse to be erected in that city.

On appeal.   Bill sustained with costs.   Temporary injunction made permanent.

This is a bill in equity brought by certain taxpayers of the city of Auburn, in which the complainants seek to restrain the defendants from erecting a schoolhouse in said city without the approval of the plans therefor by the superintending school committee of said city of Auburn.   The respondents filed a demurrer to the bill, which the presiding Justice overruled and issued a temporary injunction restraining the respondents from proceeding in the erection of said schoolhouse.   From the decree overruling the demurrer and issuing a temporary injunction, the plaintiffs appealed to the Law Court.

The opinion is stated in the opinion.

*Henry W. Oakes, and Enoch Foster,* for plaintiffs.
*Seth May,* for defendants.

SITTING: WHITEHOUSE, C. J., SPEAR, CORNISH, KING, HALEY, JJ.

SPEAR, J.   This is a bill in equity brought by the taxpayers of the defendant city to restrain the defendants from erecting a schoolhouse without the approval of the plans by the superintending school committee of the city.   A demurrer to the bill was filed, the demurrer overruled and an injunction issued.   The case comes here on appeal from this decree.

As stated by defendants' counsel:   "The fundamental issue in this case is, whether the city council of the city of Auburn may lawfully proceed to erect a schoolhouse in said Auburn and whether the city through its treasurer may lawfully pay out public money for the purpose, the plans for said schoolhouse not having been approved by the superintending school committee of the city of Auburn."   This issue is to be solved by an interpretation of certain sections of the charter of the city of Auburn, with reference to what extent these sections were intended to reserve to the city council the powers and duties which would otherwise belong to the superintending school committee of that city; and also with reference to the effect of Chapter 88, Public Laws, 1909, upon the reservation in the city charter, even upon the assumption that the theory of the defendants is right.   It may be more consistent with orderly arrangement to consider the last proposition first.   Section 1, Chapter 88, Public Laws, 1909, imposes upon the state superintendent of public schools the duty of procuring plans to be loaned to the local school committee, for proposed school buildings not exceeding four rooms.   Section 2 provides what shall be done when the State plans and specifications are not used, and applies to a house of any number of rooms.   It reads as follows:   "Sec. 2.   Where the plans and specifications prepared by the state superintendent are not used, all superintending school committees of towns in which new schoolhouses are to be erected, shall make suitable provision for the heating, lighting, ventilating and hygienic conditions of such buildings, and all plans and specifications for any such proposed school building shall be submitted to and approved by the state superintendent of public schools and the state board of health before the same shall be accepted by the superintending school committee or school building committee of the town in which it is proposed to erect such building."   Hereafter allusion to Section 2 means this section.

In applying Section 2, it is important to note that the Auburn school committee, in all respects not modified by the city charter, which was granted in 1883, are affected in precisely the same way by the public statutes, as are all the other municipal school boards in the State; that is, outside the charter, the general laws impose upon the Auburn school board the same duties, and confer upon them the same powers, as if no charter existed. If, then, the duties and powers prescribed by Section 2 are embraced in the terms of the charter and lodged in the city council, they are withheld from the Auburn school committee; if not, this section vests in the latter board all the powers and duties therein enumerated. What does the charter reserve? Section 6 provides: "Said committee shall have all the powers and perform all the duties in regard to the care and management of the public schools of said Auburn which are now conferred and imposed upon superintending school committees by the laws of this state, except as otherwise provided in this act." By Section 7, "All powers, obligations and duties in regard to said public schools not conferred and imposed upon said committee by the provisions of this act, shall be and are hereby vested in the city council of said city." The defendants' broad interpretation of these sections is found in the following paragraph of their brief: "As a whole this act while creating the superintending school committee contains two specific grants of power; the first, the care and management of schools as contained in the general laws at that time is to the school committee; the second, all powers and duties other than those denoted by the terms, care and management of schools are vested in the city council."

The general law upon this point in 1883, when the Auburn charter was granted, was as follows: "A plan for the erection or reconstruction of a schoolhouse voted by a town or district, shall first be approved by the superintending school committee."

It will be conceded that the city council is in no sense a school committee, and can perform none of the functions of that body, except by special grant of the Legislature. Accordingly any new powers or duties bestowed upon the city council must be by amendment of the charter by special act, while new powers and duties are conferred upon the school committees by public acts. It therefore follows that the provisions of Section 2 apply to the superin-

tending school committee of Auburn, a public body, but not to the city council, a chartered body. Their powers and duties are not in the least enlarged by this section, while upon the school committee of Auburn is conferred all the additional powers and duties prescribed therein. In other words, the city charter of 1883 had to do only with the powers the Legislature had seen fit to confer up to that time. The Legislature still had the right to confer such additional powers as it might see fit, at any time, and upon such board as it might see fit. The act of 1909 did confer additional powers upon the school board, and not upon the city council.

But what is the construction of the act of 1909 respecting the present issue, assuming that the charter in 1883 then reserved the power of approval to the city council? Where the plans and specifications prepared by the state superintendent are not used, the school committee, when new schoolhouses are to be erected, shall make suitable provision for the "heating, lighting, ventilating and hygienic conditions of such buildings." An analysis of these four requirements of Section 2, emphasizes their paramount importance in the composition of any plan for the erection of a modern schoolhouse. Before Section 2 was enacted, the statute, for over fifty years, had required the approval of plans by the school committee. This was undoubtedly based upon the presumption that approval would embrace these important features. But the presumption became a myth in the progress of sanitation, consequently Section 2 was enacted to make imperative what before was presumed. "Hygienic conditions," have become, under modern requirements of sanitation, vital and indispensable features of plans and specifications intended for the erection of a schoolhouse at the present time. The Legislature insisted, by the language used, that they should. The word "hygienic" takes the work of the committee into the domain of medical science. Hygiene is defined: "A system of principles or rules designed for the promotion of health." Hygienic: Pertaining to health or the science of health. Century Dic. To insure efficient action the plans must be approved not only by the state superintendent but by the board of health, composed partly of medical men. Thus important did the Legislature wisely regard the care and health of our school children.

None of these powers and duties can be exercised in the first instance, by the city council, state superintendent or board of health. But they must be exercised by the superintending school committee before any schoolhouse can be built. The statute so provides. Hence a reasonable and consistent interpretation of Section 2 requires that the plans should contain these provisions, before their submission to the State departments. Otherwise the plans would go to the departments with the most essential features left out. This is the only practical, logical thing to be done, so that when the plans go to the departments, they may contain, as fully as possible, all the details of these imperative requirements, and when returned be in form to enable immediate progress upon the work. Otherwise any plan first approved by these departments would then have to be submitted to the school committee, as to the requirements of Section 2. If they disapproved, or saw fit to make changes, as they have the unquestioned right to do, then the plans must again go to the State departments; if not approved by them, or changed, then back to the school committee again, and so on. We cannot believe the Legislature ever intended to make any such shuttlecock of the law. A mutual agreement between the school committee and the State departments is contemplated at some time, before a plan can be used, and practical common sense, if not strict construction, requires approval in the first instance by the committee.

It may be suggested that Section 2 does not apply until the schoolhouse is completed. But the language "to be erected" seems to have been employed to meet the very objection, that a completed house might be so constructed as to prevent any effective application of this section. Upon this interpretation of Section 2 it then follows, whatever the order of approval by the different departments, that before any school house can be erected, its plans, in the particulars named in Section 2, must first be approved by the superintending school committee. And as none of the powers and duties in Section 2, in these particulars, have ever been conferred upon the city council of the city of Auburn, but have been conferred upon the superintending school committee of that city, it equally follows that the city cannot erect a schoolhouse without their approval in these respects, which, as we have seen, now constitute the vital requirements of a plan. With this interpretation of the laws of 1909, it

would hardly seem possible that there could be left enough sub-
stance in the contention of the city council to warrant the continua-
tion of a controversy which may do harm to the public wellfare.

For the purpose of construing section 2 as to its effect upon the
charter we have proceeded upon the assumption that the right to
approve the plan, required in 1883, was reserved to the city council.
But this assumption is by no means conceded. The defendants, in
the able and exhaustive argument of their council, contend that the
reservation in the city charter contravenes the general laws of the
State upon this subject. The plaintiffs contend that the scheme of
the laws, giving the superintending school committee the control,
care and management of the public schools, including the approval
of plans for the erection of schoolhouses, has been the consistent
and unvarying policy of the State for more than half a century.
The defendants concede this, but assert that the language of the
city charter must be so construed as to eliminate the purpose and
intent of the general statutes, in their application to the city of
Auburn with respect to the approval of plans.

We are of the opinion that this contention cannot prevail.

Before proceeding to a comparison of the various statutes, touch-
ing the matters under consideration, it may be observed that the
city charter provides for a superintending school committee of ten
besides the mayor, as ex-officio chairman, instead of three as speci-
fied in the general law. In all other respects, except as modified by
the charter, this committee comes within the provisions of the gen-
eral law. The general scheme is found in the following statutes:
R. S., 1841, Section 4, Par. 3 invested the school committee with
authority "to direct the general course of instruction, and what.
books shall be used in the respective schools." These were then the
broadest powers conferred upon the committee. In 1857 this para-
graph is still found, in addition to which specifically appears Section
30 of Chapter 11. "A plan for the erection or reconstruction of
a schoolhouse voted by a district, shall first be approved by the
superintending school committee." In 1871 this section appears
unchanged. In 1883 it is found in the same language, except the
omission "voted by a school district." Other statutes all calculated
to augment the efficiency of our schools, have been enacted since
1883 to the present time. Without further allusion to the statutes,

it is not difficult to perceive that it is the settled policy of the State, as manifested by the progressive scheme of its laws, that the school committee were intended to be invested with the amplest powers concerning schools.

As before said, the functions of the city council are in no way related to those of the superintending school committee. Nor are the functions, which it is claimed the council are authorized to perform, conferred upon them in express words. They are reserved in general terms only as a supplement to the powers and duties, conferred in express terms, and by the general law, upon the committee. The reservation in the city charter, as well as the section relating to the school committee, has already been quoted. We think it important to now discover the intention of the Legislature, for the intent of the Legislature is the law. *Carrigan* v. *Stillwell*, 99 Maine, 434; *Orono* v. *B. R. & E. Co.*, 105 Maine, 428. To do this these two sections must be considered together. What did the Legislature intend by the reservation? We have seen that the policy of legislation has been to place increased power in the hands of the school committee. This is in harmony with wise practice and long experience. The common schools are our most cherished institutions. Our people, through their representatives, have recognized this fact by generous and progressive laws. No department of our State government requires officials to be selected with greater care. It is the purpose of the laws, and has been from our earliest history, to place in office, competent officials for the management of our schools. These officials are presumed to be chosen for their peculiar qualifications.

In view, not only of this long settled policy but demanded fitness of school officials, can it be contended that the Legislature, in 1883, intended to deprive the city of Auburn of the services of a specially selected board, and confer their duties upon a promiscuous board? Can it be that it intended to constitute a regular school committee, and confer its important functions upon the city council? Can it be presumed that they intended to confer dual powers? If so, it was an inconsistent act, and sooner or later was almost certain to result in a conflict of authority; and what should have been anticipated has actually happened. But it cannot for a moment be conceded

that the Legislature ever intended to divide these powers and duties between two incongruous boards.

It is accordingly evident, that the reservation, in the city charter, was intended to authorize the council to supplement the committee, in any unimportant matters that might have been inadvertantly left out, in enumerating the powers and duties of the committee. Further, if the Legislature had intended to confer upon the city council the power it now claims, it certainly would have done so by express grant and not by inference from general terms. The intention of the Legislature being established, will the language of the statute, creating the school committee, permit it to be carried into effect? The committee shall "have all the powers and perform all the duties in regard to the care and management of the public schools of said Auburn which are now conferred and imposed upon superintending school committees by the laws of this State, except as otherwise provided in this act."

It is contended by the defendants that the words "care and management" do not confer upon the committee the right to insist upon the approval of plans. If these words were used only in this section, without reference to other statutes, this contention would be entitled to but little weight. The word "management" would confer all the powers acceded to the committee by the defendants. The word "care" therefore must be accorded some meaning. It is a word of broad comprehension and, in the connection in which it is used, can be construed without violence to the language, to convey the power of approving of the plans. But statutes are always construed in pari materia. It is obvious that this must be done in order to give consistency of construction. Otherwise statutes would become felos de se. Accordingly, we must determine, not what the words "care and management" by themselves mean, but what the Legislature intended them to mean, when interpreted with reference to other statutes, relating to the same subject matter, and in view of the general scope, purpose and subject matter of the enactment. Construed by this general and universal rule, our conclusion is, that the words "care and management," as used in the city charter, continued, in the superintending school committee of the city of Auburn, the power and duty of approving the plans for any schoolhouse to be erected in that city.

It may be further observed that section 2 already construed, is in harmony with this interpretation. And while a subsequent expression of the Legislature may not be final as to the construction of an earlier one, it is yet entitled to much respect when consistent with the object and intent of the earlier legislation.

*Bill sustained with costs.*

*Temporary injunction made permanent.*