**CITY OF WATERVILLE et al.**

**v.**

**BARTELL TELEPHONE TV SYSTEMS
et al.**

Supreme Judicial Court of Maine.

Oct. 17, 1967.

Burton G. Shiro, Morton A. Brody, Waterville, Sidney W. Wernick, and Christopher A. Moen, Jr., Portland, for plaintiffs.

Frank G. Chapman, Augusta, David B. Bartell, New York City, Vincent L. Mc-Kusick, Donald A. Fowler, Jr., Portland, Robert D. Bruce, Boston, Mass., for defendants.

Richard B. Sanborn, Augusta, Maine Municipal Ass'n amicus curiae.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, DUFRESNE and WEATHERBEE, JJ.

WEBBER, Justice.

This case, reported for our decision pursuant to M.R.C.P., Rule 72(a), raises as a primary and fundamental issue the nature and extent of control which a municipality is permitted to exercise in the relatively new field of community antenna television (hereinafter called CATV). Plaintiffs seek injunctive relief (a) to prevent defendant Bartell Telephone TV Systems (hereinafter called Bartell) from offering CATV service to subscribers in Waterville without municipal franchise or permit therefor, and (b) to prevent defendant New England Telephone and Telegraph Co. (hereinafter called New England) from transmitting Bartell's television signals by means of New England's cables and equipment to Bartell's customers under a tariff filed with and approved by the Public Utilities Commission.

In 1885 the Legislature by Chapter 513 of its Private and Special Laws of that year granted to New England certain authority, the pertinent portions of which are as follows:

"Sect. 2. Said New England Telephone and Telegraph Company is hereby authorized to construct, maintain and operate *its telephone lines throughout the length and breadth of this state,* with as many wires and branches as they may see fit, commencing and terminating at such point or points as they may select within the limits aforesaid, * * *.

"Sect. 3. Said corporation shall have the right to erect and construct the posts, piers, abutments and other fixtures necessary to sustain the wires of its lines upon, along and across any public way, road, street or bridge, * * * and in such manner as not to incommode or endanger the customary public use thereof; first having obtained consent of the municipal officers of any city or town where their lines are to be built, * * *.

"Sect. 4. The municipal officers of a place in which the said posts, piers, abutments and fixtures are to be erected, shall, on written application, specify where the same may be located, and after the erection thereof, having first given the company an opportunity to be heard, after five days notice they may direct any alteration in the said location.

"Sect. 5. Said company may use *such telegraphic appliances as may be necessary or convenient* for the dispatch of their business." (Emphasis ours.)

By a series of permits the City of Waterville granted to New England authority to "erect and maintain poles and cables and wires to be placed thereon" in the public streets and ways of that city. No new or additional pole permits are presently required to enable New England to render the proposed tariff service.

In 1965 there was introduced in the 102d Legislature L.D.No. 1231, "An Act to Regulate Community Antenna Television Companies as Public Utilities". This proposed law, if adopted, would have done exactly what its title suggests. It was, however, reported out of Committee "Ought not to pass" and was summarily rejected without discussion on the floor of either House.

At the same legislative session there was introduced L.D.No. 1023, "An Act Relating to Municipal Regulation of Community Antennae Television Systems". This bill proposed to amend the existing law (30 M.R.S.A. Sec. 2151—Police Power Ordinances) by adding to subsection 2, captioned "Public ways and other public property", a new paragraph which, as proposed, would have read:

"To authorize its municipal officers to contract on such terms and conditions, *and impose such fees,* as are in the best interests of the municipality, for the placing and maintenance of community antennae television systems and appurtenances *along public ways. Revenues received* from such contracts shall be

credited to general funds. Systems located in accordance with such ordinances and contracts are not defects *in public ways.*" (Emphasis ours.)

That this proposed legislation received careful consideration is evidenced by the fact that it emerged from Committee in new draft as L.D.No. 1566, which after amendment in one respect was enacted as law. P.L.1965, Ch. 377. The new paragraph amending 30 M.R.S.A. Sec. 2151, Subsec. 2 is in these terms:

"H. The municipal officers may contract on such terms and conditions as are in the best interests of the municipality, for the placing and maintenance of community antennae television systems and appurtenances *along public ways.* Systems located in accordance with such ordinances and contracts are not defects *in public ways.*

"The municipal officers may establish *such fees as are necessary to defray the costs* of public notice, advertising and the expenses of hearings relating to applications for a contract, *but in no case to exceed $25 per applicant.* * * *."
(Emphasis ours.)

We note at the outset that this paragraph was deemed to have application to use by CATV operators of the municipal streets and ways. It was placed in company with other paragraphs dealing with "Public ways and other public property" rather than, for example, with those found in subsection 5 captioned "Commercial" and dealing with the regulation of certain types of business activity. It is significant that all the paragraphs in subsection 2 deal with such related subjects as trees, sidewalks, parking meters, public telephones and structures or other things on, above or beneath the public ways. Moreover, the express terms employed, "along" and "in public ways", emphasize and clarify legislative intent to enable municipalities, not to regulate generally the business of CATV, but rather to regulate the use to be made by CATV operators of the public ways.

It is equally clear that the Legislature did not intend that municipalities should make use of this enabling act to create a new source of revenue. The deletion from the proposed draft (L.D.No. 1023) of the phrase in its first sentence, "and impose such fees", and of its second sentence. "Revenues received from such contracts shall be credited to general funds", are indicative of such intent, especially when viewed in contrast to the carefully restrictive sentence added to the draft as enacted. That sentence expressly limits the revenue aspect to "such fees as are necessary to defray the costs" thereafter specified and "in no case to exceed $25 per applicant."

On December 6, 1966 the City Council of the City of Waterville amended the Revised Ordinances of that city by adding a new chapter as follows:

## "COMMUNITY ANTENNAE TELEVISION SYSTEMS

"The Municipal Officers are hereby authorized to enter into a written contract for the placing and maintenance of a community antennae television system and appurtenances along public ways of the city; said contract to conform with the 'Requirements for Community Antennae Television Systems' as set forth by the Municipal Officers.

"Each applicant for a contract shall deposit with the City Clerk, a fee of $25.00 to defray the costs of public notice, advertising and expenses of a public hearing."

On February 7, 1967 this ordinance was further amended by adding the following:

"No person, firm, association or corporation either public utility or otherwise shall place or maintain any Community Antennae Television System or any part or appurtenance thereof along or upon any public way in the City of Waterville without contracting therefor in accordance with the foregoing with the municipal officers of the City of Waterville.

"The Building Inspector is authorized to institute or cause to be instituted by the City solicitor in the name of the City of Waterville any and all actions, legal or equitable, including injunctive procedures without proof of independent, irreparable damage, that may be appropriate or necessary for the enforcement of this Ordinance; provided, however, that this section shall not prevent any person entitled to equitable relief from enjoining any act contrary to the provisions of this Ordinance."

The "Requirements for CATV", 25 in number, which we will treat for the purposes of this case as having been incorporated by reference into the ordinance and adopted by the Municipal Officers, included:

"17. An exclusive contract with percentage of gross, it being understood that there is no competing system within the City of Waterville, whether franchised or not."

It is immediately apparent from a reading of this "requirement" that the City misconstrued the enabling act and read into it the transmission to the municipality of authority and power not within the legislative intent. It is entirely possible for CATV to be operated by one who makes no direct use of the public streets and ways whatever either through the use of private property (usually denominated "house-top" systems) or through service supplied by established public utility companies. The City was powerless under the strictures of the enabling act to assure any CATV operator by "contract" or otherwise that there would be "no competing system within the City of Waterville". Nor, as already noted, was there authority to require, even as a condition for installing his own poles and/or cables and wires in public ways, that the CATV operator contract to pay to the City a "percentage of gross". Our court said in Lunn v. City of Auburn (1913) 110 Me. 241, 248, 85 A. 893, 896 that "if the Legislature had intended to confer upon the

city council the power it now claims, it certainly would have done so by express grant, and not by inference from general terms." See State of Maine v. Brown (1936) 135 Me. 36, 40, 188 A. 713. As defendants properly point out, the language of this statute is so clear as not even to permit an inference that such power exists.

We turn now to the status of the respective parties in the light of the enabling statute and ordinances already discussed.

■ Plaintiff Drapeau is engaged in the business of radio and television sales and repair in Waterville and desires to operate there a CATV system as a local monopoly. All applicants for CATV "contracts" were required by the city to file sealed "bids" setting forth their proposed rate schedule and proffered "franchise percentage fee". As one such applicant, Drapeau filed his schedule and in effect offered to pay "2% of gross annual revenue less any property taxes which may be levied by the city." At the bid opening the Municipal Officers voted "that Mr. Drapeau and the City Solicitor meet to draw up a contract to be submitted to the Municipal Officers for approval". No steps have yet been taken to implement this vote or negotiate a "contract". Such a "contract", in order to be valid and binding upon both parties, would have to conform to limitations imposed upon the city by the enabling act. The "contract" in final form must be approved by the Municipal Officers. Mr. Drapeau has not yet had occasion to acquire a tower location or any CATV equipment and has not otherwise changed his position. It is apparent that he has not as yet acquired standing to prosecute this action as plaintiff. Beck v. City of Waterville (Me.1966) 221 A.2d 831.

■ Bartell was at the time of hearing nearly ready to render CATV service to its Waterville subscribers. It had installed on private property in an adjoining community a tower, an antenna array, all necessary head-end pre-amplification equip-

ment and was engaged in installing wiring on its subscribers' premises. It had completed arrangements with New England for the transmission of its signals over New England cables. It neither needed nor intended to install any of its own equipment in or along any public ways in Waterville. Acting upon the assumption that a permit or "contract" was therefore not required, it had applied for none from the City. We hold that Bartell was correct in this legal assumption and that the enabling act, 30 M.R.S.A. Sec. 2151, Subsec. 2 as amended, had application only to the "placing and maintenance of community antennae television systems and appurtentances *along public ways.*" (Emphasis supplied.)

■ The final and decisive issue is whether or not New England in offering a tariff service to such CATV operators as may desire it is required to secure a permit or "contract" from the City. The City contends that since New England will make use of cables and other equipment specially designed to transmit television signals "one way", it will be involved with "the placing and maintenance of community antennae television systems and appurtenances along public ways" within the meaning of Par. H. of 30 M.R.S.A. Sec. 2151, Subsec. 2. Stated otherwise, the City's position is that the service offered to CATV operators is not "telephone" business and is not a public utility service within the scope of New England's franchise. New England urges that its legislative franchise should not be narrowly construed and that its right to "construct, maintain and operate its telephone lines through the length and breadth of this state, with as many wires and branches as they may see fit" (P. & S. L. 1885, Ch. 513, Sec. 2) coupled with its authority to "use such telegraphic appliances as may be necessary or convenient for the dispatch of their business" (Sec. 5) includes the right to render this service. New England asserts that its franchise should be broadly construed to encompass the "transmission of intelligence by electricity", a legislative phrase employed in 35 M.R.S.A.

Sec. 2481 (which is the first section of Chapter 179 dealing with the "Regulation of Poles and Wires").

We have examined the opinions of regulatory bodies and of the few courts of last resort which have had occasion to deal with some form of the problem and are satisfied that with one possible exception they sustain the position contended for by New England. It follows that a public utility enfranchised as is New England cannot be required to secure an additional municipal franchise to transmit television signals.

Plaintiffs rely primarily upon two cases. In the first of these, Television Transmission, Inc. v. P.U.C. (1956) 47 Cal.2d 82, 301 P.2d 862, 865, the issue was whether or not a CATV operator which transmitted its signals through its own lines on a pole rental basis thereby became a public utility and subject to Commission regulation. The court held that since it did not offer any two way telephone service it could not be deemed to be a "telephone corporation" and thereby a public utility. The court was careful to point out that it does not follow that a "telephone corporation" loses its status as such merely by adding as one of its services the transmission of television signals. Distinguishing Pacific Telephone & Telegraph Co. v. City of Los Angeles (1955) 44 Cal.2d 272, 282 P.2d 36, the court said "Pacific Telephone and Telegraph Company was unquestionably a telephone corporation, and it remained a telephone corporation *and its lines remained telephone lines,* even though they were incidently used to transmit other forms of communication. * * * It does not follow, however, that because *telephone corporations are not prevented by law from using their lines, which are unquestionably telephone lines, for the transmission of television broadcasts,* any corporation that uses poles, wires, et cetera to transmit such broadcasts is a telephone corporation." (Emphasis ours.)

The other case to which plaintiffs solicit our particular attention is Radio Telephone Commun. Inc. v. Southeastern Tel. Co. (Fla.

1964) 170 So.2d 577. Here the defendant was a public utility engaged in the telephone business and as an incident thereto in radio telephone communication. Plaintiff was engaged only in radio communication but did not offer any standard two way communication by wire. The court identified the decisive issue as being whether or not the plaintiff was a "telephone company" within the meaning of the Florida statute. The court held that the Florida legislature had not entered the field of regulating radio communication and that when it did so, it would evidence its intention by clear and express language. The court concluded that plaintiff was not a "telephone company" subject to Commission regulation and therefore was not required to procure a certificate of public convenience and necessity. The opinion emphasized the fact that the Florida Legislature has never conferred upon the Commission any general authority to regulate "public utilities" but has proceeded a step at a time to enact a separate comprehensive plan of regulation and control for each form of public service. In a subsequent case in deference to the court, but noting that the law is otherwise in at least 32 states, the Florida Public Service Commission felt compelled by the decision in Radio to conclude that the Legislature had conferred upon it no jurisdiction to approve tariffs proposed by a telephone company for the transmission of television signals for CATV companies. Re So. Bell Tel. & Tel. Co. (1966) 65 P.U.R. 3rd (Fla. P.S.C.) 117. If the commission is correct in anticipating what the Florida court's view would be where the transmission of television signals is merely an additional communication service offered by a telephone company, then we must conclude that thus far Florida stands alone.

A number of decisions express a contrary view. In Ball v. American Tel. & Tel. Co. (1956) 227 Miss 218, 86 So.2d 42, 45, an eminent domain statute permitted telephone and telegraph companies to exercise the right for the purpose of constructing new lines. The question was whether or not the right existed where the new line would be used in part to transmit television signals. Holding that eminent domain might properly be exercised, the court said:

"Television is but one of many scientific achievements of the past few decades made possible by developments of the carrier art. Some of the others are radio, teletype, and the phototelegraph, each of which employs electrical impulses in transmission. All these devices to some extent make use of cables and wires in the transmission process. Transmission techniques developed by or as an adjunct of the telephone business has made possible the services performed by these devices.

We should not construe the eminent domain statutes so as to require the telephone and telegraph companies to secure new easements for every new device that employs the use of electrical impulses even when the new device performs a function other than the transmission of sound or articulate voice. To do so would lead to absurd and unreasonable results. *We conclude that television transmission is an integral part of the telephone and telegraph business as it has developed and now exists.*"

(Emphasis ours.)

In Independent Theater Owners of Arkansas, Inc. v. Arkansas Pub. Service Com'n (1962) 235 Ark. 668, 361 S.W.2d 642 the court held that the sending of electrical impulses over a coaxial cable owned and serviced by a telephone utility, which produced a picture or sound, was the conveying of a message or communication by telephone and thus a public utility service subject to Commission regulation. See also So. Bell Tel. & Tel. Co. v. City of Meridian (1961) 241 Miss. 678, 131 So.2d 666.

In the case of Pacific Tel. & Tel. Co. v. City of Los Angeles (supra) it was contended that the state franchise given to a telephone utility did not give the company the right to use its telephone lines for the transmission of anything other than "artic-

ulate speech". The Court said, "Section 536, which authorizes telephone companies to construct their lines along public highways, places no restrictions upon what may be transmitted by means of electrical impulses over those lines, * * *." In our view the same can be said of the state franchise granted to New England.

A number of regulatory bodies have had occasion to deal with the subject and we find their reasoning persuasive.

In Midwest Video Corp. v. Southwestern Bell Tel. Co. (1961) 39 P.U.R.3rd (Ark. P. S.C.) 496, a CATV company sought to compel a regulated telephone company to provide channel service at rates to be approved by the Commission. The Commission ordered the service to be rendered, treating it as one of the public utility services the utility "undertakes to provide to all members of the public who desire it."

The issue before us in the instant case was squarely presented to the New York Public Service Commission. In Re New York Tel. Co. (1960) 34 P.U.R.3rd (N.Y. P.S.C.) 115 the Commission said:

"The initial question to be decided is whether the proposed service to be rendered by the telephone company is telephone or telegraph service and, therefore, properly the subject matter of a tariff filing by it with the public service commission. It is quite apparent that principles common to telephony and telegraphy, i. e., transmission of intelligence via electrical impulse, will be employed in the transmission of television signals and associated audio signals over the channels to be provided by the telephone company. * * * Similarly, the telephone company by offering channels to an antenna company is offering to provide a communication service—a variety of telephony or telegraphy—and nothing else. The mere fact that at this stage of the development of this form of picture and sound transmission special coaxial cable and other special equipment must be in-

stalled in order to provide this particular service does not militate against the conclusion that the telephone company is providing telephone or telegraph service. * * * It is clear that the telephone company is undertaking to transmit intelligence from one point to another for the benefit of a subscriber, using principles of telephony (or telegraphy). It proposes to provide this service upon similar terms to one and all seeking it."

The Commission permitted the filing of a tariff and the rendering of the service.

In Jackson v. Mich. Bell Tel. Co. (1966) 63 P.U.R.3rd (Mich. P.S.C.) 384, a municipality granted its franchise to Jackson T. V. Cable Co. which proposed to transmit its television signals either by using its own poles or by means of pole rental agreements. Its competitor, Cascade Cable T. V. Co., proposed to operate without franchise from the city by means of the tariff service offered by a telephone company. The city sought to prevent the telephone company from furnishing its service to Cascade. The Commission found that "the technical problems encountered in the transmission of television channels * * * are the same as those encountered in the transmission of other high frequency, broadband communication channels, such as closed circuit television, facsimile, and data transmission, thus, this tariff (CATV) offers an established type of service, put to a different use than previous tariff offerings, *and is a part of the overall communication services* of Mich. Bell Tel. Co." (Emphasis ours.) The Commission concluded that the telephone company could properly render the service to Cascade, whether or not the latter had acquired any municipal CATV franchise. See also Int. Cable T. V. Corp. v. All Metal Frabricators, Inc. (1966) 66 P.U.R.3rd (Cal. P.U.C.) 446; Re Seneca Radio Corp. (1964) 57 P.U.R.3rd (Ohio P.U.C.) 67.

We conclude as have the several cited authorities that New England in providing as a public service the transmission of tele-

vision signals has not exceeded the authority granted by legislative franchise. The rates and service thus provided are subject to the regulation and control of the Public Utilities Commission, but not of any municipality. New England possesses all necessary pole permits from the City of Waterville to provide this service. New England is not required to obtain any "contract" from the City before rendering the service contracted for by Bartell. Bartell requires no permit or "contract" from the City for the reasons fully stated above.

The entry will be

Judgment for the defendants.

MARDEN, J., did not sit.